1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10  HERMAN LEE HILL,

11          Petitioner,              No. CIV S-06-0262 FCD GGH P

12      vs.

13  JEANNE WOODFORD, et al., Warden,

                                    FINDINGS AND RECOMMENDATIONS
14          Respondent.

15  _____/

16  I.  Introduction

17          Petitioner, a state prisoner proceeding pro se,[1] has filed a petition pursuant to 28

18  U.S.C. § 2254.  In 2002, petitioner was convicted in Sacramento County Superior Court of two

19  counts of robbery (Cal. Penal Code § 211) with enhancements for the offenses having been

20  committed to benefit a street gang (Cal. Penal Code § 186.22(b)(1)) as well as for being armed

21

22          [1] The court notes that petitioner, at the time of filing the petition, filed a request for
    appointment of counsel on 2/07/06, not specifically addressed in the subsequent briefing order;
23  however, although not therein addressed, the request was implicitly denied.  There currently
    exists no absolute right to appointment of counsel in habeas proceedings, see Nevius v. Sumner,
24  105 F.3d 453, 460 (9th Cir. 1996), although 18 U.S.C. § 3006A authorizes the appointment of
    counsel at any stage of the case "if the interests of justice so require."  See Rule 8(c), Fed. R.
25  Governing § 2254 Cases.  In the present case, the court implicitly found that the interests of
    justice would not be served by the appointment of counsel at the time of the request, nor does the
26  undersigned find that the interests of justice would be served by appointment of counsel at the
    present time.

with a firearm (Cal. Penal Code § 12022 (d)),[2] and was sentenced to an 18-year term in state prison.  CT 24, 609-610.[3]

Petitioner challenges his conviction/sentence on the following grounds: 1) insufficient evidence to support the gang enhancements under Cal. Penal Code § 186.22 (b); 2) trial court violated petitioner's due process rights under the Fifth, Sixth and Fourteenth Amendments in failing to define "primary activities" as that term is used in the gang enhancement statute; 3) trial court violated petitioner's Fourteenth Amendment right to due process by admitting prejudicial and inadmissible gang expert testimony and other gang evidence; 4) trial court erred by failing to give a promised limiting instruction regarding the gang evidence and petitioner was denied effective assistance of counsel by the failure to ensure the instruction was given; 5) trial court committed prejudicial error and violated petitioner's right to due process and trial by jury under the Fourteenth Amendment by including witness intimidation as one of the predicate offenses in the gang enhancement instructions given to the jury, and was denied effective assistance of counsel when counsel failed to object to the instruction; 6) trial court erred in qualifying Officer Gracia as an expert and allowing her to testify as to legal conclusions; 7) petitioner was denied his Sixth Amendment right to counsel at a critical stage of

_____

[2] On appeal, the trial court was directed to amend petitioner (and his co-defendant's) abstract of judgment to show the enhancements to count one and two were committed pursuant to Cal. Penal Code § 12022 sub. (a) rather than (d), and the sentence(s) modified as to the second robbery count to a four-month, rather than an eight-month consecutive term under § 12022(a). People v. Hill, 2005 WL 1534292, at *22 (Jun 30, 2005) (not reported); also lodged by respondent as Document 1, Exhibit A.

[3] "Codefendants Herman Lee Hill (Herman) and Henry Ivory Hill (Henry) are brothers who were convicted by a jury of two counts of robbery (Pen.Code, § 211-counts one and two), [] with enhancements on each count for committing the offenses for the benefit of a criminal street gang ([Cal. Penal Code]§ 186.22, subd. (b)(1)) and being armed with a firearm ([Cal. Penal Code]§ 12022, subd. (d)).  Probation was denied and defendants were each sentenced to serve 18 years in state prison, consisting of a low term of two years on the first count of robbery plus 10 years consecutively for the gang enhancement and one year consecutively for being armed, and a five-year consecutive term (consisting of one-third of the midterm) on the second count of robbery with enhancements."  People v. Hill, 2005 WL 1534292, at *1-3 (Jun 30, 2005) (not reported).

1  the proceedings when the trial court failed to appoint counsel to investigate his claim that he was

2  denied effective assistance of counsel at trial as a basis for a new trial motion; 8) petitioner was

3  denied his federal constitutional right to a jury trial and the court acted in excess of its

4  jurisdiction when petitioner was sentenced to consecutive terms based on facts beyond those

5  found true by the jury under Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004).

6  II.  AEDPA

7          The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to this

8  petition for habeas corpus which was filed after the AEDPA became effective.  Neelley v. Nagle,

9  138 F.3d 917 (11th Cir.), citing Lindh v. Murphy, 521 U.S. 320, 117 S. Ct. 2059 (1997).  The

10  AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential

11  standards of review to be used by a federal habeas court in assessing a state court's adjudication

12  of a criminal defendant's claims of constitutional error.  Moore v. Calderon, 108 F.3d 261, 263

13  (9th Cir. 1997).

14          In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

15  Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion

16  for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy

17  between "contrary to" clearly established law as enunciated by the Supreme Court, and an

18  "unreasonable application of" that law.  Id. at 1519.  "Contrary to" clearly established law applies

19  to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme

20  Court on a point of law, or (2) if the state court case is materially indistinguishable from a

21  Supreme Court case, i.e., on point factually, yet the legal result is opposite.

22          "Unreasonable application" of established law, on the other hand, applies to

23  mixed questions of law and fact, that is, the application of law to fact where there are no factually

24  on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

25  Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the

26  AEDPA standard of review which directs deference to be paid to state court decisions.  While the

1  deference is not blindly automatic, "the most important point is that an *unreasonable* application

2  of federal law is different from an incorrect application of law....[A] federal habeas court may not

3  issue the writ simply because that court concludes in its independent judgment that the relevant

4  state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

5  that application must also be unreasonable." Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

6  1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

7  objectively unreasonable nature of the state court decision in light of controlling Supreme Court

8  authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

9         The state courts need not have cited to federal authority, or even have indicated

10  awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S.

11  Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

12  contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An

13  unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

14  occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the

15  established Supreme Court authority reviewed must be a pronouncement on constitutional

16  principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

17  binding only on federal courts.  Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

18         However, where the state courts have not addressed the constitutional issue in

19  dispute in any reasoned opinion, the federal court will independently review the record in

20  adjudication of that issue.  "Independent review of the record is not de novo review of the

21  constitutional issue, but rather, the only method by which we can determine whether a silent state

22  court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

23  2003).

24  III.  Factual Background

25         The court's independent review confirms the facts of this case have been

26  accurately set forth in the unpublished Third District Court of Appeal opinion on petitioner's

4

direct appeal; any modifications this court makes are footnoted:

> On June 1, 2001, at approximately 2:40 p.m., the New American-Asian Market (Asian Market) was robbed. At approximately 6:30 or 7:00 p.m. on the same day, the Express Market was robbed.

> Dang Lor, the owner of the Asian Market, testified that a young, Black male, later identified as 14-year-old Jesse Davis, entered the store, purchased some candy, and "browse[d]" for nearly an hour. Then, two other people came in the store but did not speak to Lor or attempt to buy anything. Davis looked toward the two individuals, then pulled out a gun, pointed it at Lor and told Lor to give him "the money." Davis put the money in a plastic bag provided by Lor and, as Davis ran out of the store, Lor heard a gunshot. The two individuals who had entered the store just before the robbery said nothing to Lor and, about one minute later, walked out.

> Lor provided a description to a police officer of the two individuals, which matched defendants' appearance in several respects. When Lor was shown photographs of defendants approximately two months after the robbery, he identified them as the two individuals who entered the store before the robbery. However, at trial, Lor could not identify defendants and denied providing the police officer with a description of the two individuals.[4]

> Gurmail Singh, part owner of the Express Market, reported he was robbed at gunpoint by a young, Black male, later identified as Davis. According to Singh, *Davis* went in and out of the store three times, and used the phone outside the store, before approaching Singh at the cash register, taking out a gun and asking for money. Davis shot Singh during the robbery. The Express Market was equipped with video cameras, and a videotape of the robbery was played for the jury.

> Anthony Maddox testified that he saw a Black male on the phone outside the Express Market shortly before the robbery. He also saw a blue, mid-sized, older model car parked on the side of the market.

> Shortly after the Express Market robbery, Daniel Newrider, who

---

[4] As to denying that he had provided a description to a police officer, however, when later called by the defense as a witness for petitioner, Dang Lor although providing somewhat vacillating and contradictory testimony on several points, on cross-examination by the prosecutor appeared ultimately to confirm that he had told Officer Vang in Hmong that two of the people who were in his store when he was robbed had "cornrows in their hair" and he believed he had told the officer that the two subjects were eighteen or nineteen, although he denied he had described their height in feet.  RT 1396.

lived in the vicinity of the market, told a police officer that he noticed "[a] large 1970's white-over-blue Cadillac" parked in a field about a block from the market. He saw the car traveling toward the market and then saw an individual running in the opposite direction. Next he saw the car driving after the individual. Newrider gave the police officer a description of the individual, which was generally consistent with a description provided by Maddox of the Black male he saw outside the market on the phone. At trial, Newrider denied describing the car to the officer and denied providing a detailed description of the individual he saw running down the street.

Davis was arrested on June 6, 2001, after relatives confirmed his identity in a surveillance photograph.  Davis acknowledged he was the individual in the surveillance photograph and indicated that two other people-"Edward and Kenny"-were also involved in the robbery. Eventually, Davis admitted that defendants, not "Edward and Kenny," were with him when he committed the robberies, explaining that he had lied about their identities because he was afraid "they would beat me up and stuff."

Davis testified he was at defendants' house at around noon on June 1, 2001, when Henry asked him if he wanted to make some money. Later, Henry told Davis they were "going to rob a store." Henry gave Davis a gun and instructed Davis to point the gun and ask for money. Henry said that Herman and he would wait in the car while Davis went into the store. They left defendants' house in Herman's white-topped, blue Cadillac, with Herman driving, and went to the Asian Market. They parked across the street from the market, and Henry instructed Davis to point the gun at the ground and "pull one shot" during the robbery.

Davis testified that when he entered the market, he walked around "buying stuff" because he was nervous. According to Davis, after about 30 minutes, defendants entered the market and Davis committed the robbery. Davis fired the gun in the doorway of the store, then ran back to the car and waited for defendants, who arrived after about a minute. Davis and defendants got in the car and returned to defendants' house, where they split up the money.

At defendants' house, Henry asked Davis whether he wanted "to go do another one," and Davis agreed. After an "hour or two," they drove to the Express Market in Herman's car with Herman driving. Henry instructed Davis to "do the same thing as you did in the first store and then pull off some shots." Henry also told Davis to "shoot one of the people." Defendants let Davis out about a block away from the store and drove away. Davis entered and exited the store several times because he was nervous. Eventually, he pulled out the gun and told the clerk "to give [him] the money." Davis fired the gun twice, his hand jerking up when he fired the second time such that he shot Singh. Davis ran out of the store and around

the corner, where he was picked up by defendants, who came from behind in the car. They returned to defendants' house, where they split up the money, and Davis returned the gun to Henry.

Davis testified that Henry and he were members of a gang called the Nogales Gangster Crips, but that he did not believe Herman was a member of the gang. According to Davis, Henry was senior to him in the gang, and he was afraid of Henry and felt pressure from him to commit the robberies. Davis admitted he had beat up another individual when told to do so by Henry, explaining he had to beat him up "to earn respect in [the] gang." According to Davis, after the robbery charges were filed, Henry "socked [him] in [his] face" and threatened him for talking to  the police. Davis was afraid of the Nogales Gangster Crips because "snitches" "[g]et killed."

Davis acknowledged that a gang member earned more respect by committing murder and robbery. He testified he had to shoot someone during the second robbery "to earn a stripe," which, as later explained by a gang expert, meant "doing certain things" to gain status within the gang. Davis testified he pleaded guilty to the robberies and agreed to testify at defendants' trial in exchange for a sentence of 12 years in state prison. Potentially, Davis could have received a life sentence.

Five days after the robberies, Herman was interviewed by a Sacramento police detective. Initially, Herman said that on the day of the robberies, he went fishing, worked on his car, picked up something to eat, then remained home for the rest of the evening. When Herman was told that witnesses had seen a vehicle matching his car's description behind the Express Market, Herman said there was a car that looked just like his that was known to be in the area. Next, Herman claimed that, "the following morning," "he found his car and house ransacked and his keys were missing from the car." When the detective continued to "push him," Herman reported that "Black" (identified by Henry as "Jesse") had held him at gunpoint to rob the Express Market. Herman said that Black left him in the car for "like five or six seconds" to go into the store and commit the robbery. According to Herman, Black threatened to shoot his mother. Herman said that after the robbery, Black returned to the car and made Herman "ride real far" and drop him off.

Five days after the robberies, Henry also made a statement to a police detective. Henry said that on the day of the robberies, Black wanted to "hang out" with Herman and him but they had refused. Henry initially denied he had gone to the Asian Market that day. However, during a subsequent interview two days later, after being taken into custody for questioning, Henry admitted he had gone to the Asian Market in Herman's car with Herman and Joe Williams. According to Henry, he was in the market to buy a soda when

Black came in "waving a gun" and robbed the store. Henry said Williams and he walked home together from the market.

Approximately two weeks after providing this statement, Henry and Herman were arrested after they fled from police officers into a family residence. A "[w]hite-over-blue older Cadillac," which was registered to Herman, was parked in the driveway of the adjacent home.

People v. Hill, 2005 WL 1534292, at *1-3 (Jun 30, 2005) (not reported)***(also lodged by respondent as Document 1*, Exhibit A.*

III.  Discussion

Claim 1 - *Insufficient Evidence of Primary Activity or of Specific Intent*

*Legal Standard*

When a challenge is brought alleging insufficient evidence, federal habeas corpus relief is available if it is found that upon the record evidence adduced at trial, viewed in the light most favorable to the prosecution, no rational trier of fact could have found "the essential elements of the crime" proven beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979).  Under Jackson, the court reviews the entire record when the sufficiency of the evidence is challenged on habeas.  Adamson v. Ricketts, 758 F.2d 441, 448 n. 11 (9th Cir. 1985), vacated on other grounds, 789 F.2d 722 (9th Cir. 1986) (en banc), rev'd, 483 U.S. 1 (1987).  It is the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts."  Jackson, 443 U.S. at 319, 99 S. Ct. at 2789.  "The question is not whether we are personally convinced beyond a reasonable doubt.  It is whether rational jurors could have reached the same conclusion that these jurors reached."  Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991).

If the trier of fact could draw conflicting inferences from the evidence, the court in its review will assign the inference that favors conviction.  McMillan v. Gomez, 19 F.3d 465, 469 (9th Cir. 1994).  The fact that petitioner can construct from the evidence alternative scenarios at odds with the verdict does not mean that the evidence was insufficient, i.e., that no reasonable

1   trier of fact could have found the conviction scenario beyond a reasonable doubt.

2          In reviewing the sufficiency of the evidence supporting a
       conviction, we search the record to determine "whether a
3       reasonable jury, after viewing the evidence in the light most
       favorable to the government, could have found the defendants
4       guilty beyond a reasonable doubt of each essential element of the
       crime charged."
5
       United  States v. Douglass, 780 F.2d 1472, 1476 (9th Cir.1986).
6       *The relevant inquiry is not whether the evidence excludes every
       hypothesis except guilt, but whether the jury could reasonably
7       arrive at its verdict.* United States v. Fleishman, 684 F.2d 1329,
       1340 (9th Cir.), cert. denied, 459 U.S. 1044, 103 S. Ct. 464, 74 L.
8       Ed.2d 614 (1982); United States v. Federico, 658 F.2d 1337, 1343
       (9th Cir.1981), overruled on other grounds, United States v. De
9       Bright, 730 F.2d 1255, 1259 (9th Cir.1984) (en banc).

10  United States v. Mares, 940 F.2d 455, 458 (9th Cir. 1991)(emphasis added).

11          Superimposed on these already stringent insufficiency standards is the AEDPA

12  requirement that even if a federal court were to initially find on its own that no reasonable jury

13  should have arrived at its conclusion, the federal court must also determine that the state

14  appellate court not have affirmed the verdict under the Jackson standard in the absence of an

15  unreasonable determination.  Juan H. v. Allen, 408 F.3d 1262 (9th Cir. 2005).

16          *Analysis*

17          In his first claim, wherein petitioner contends that there was insufficient evidence

18  to support the gang enhancements under Cal. Penal Code § 186.22 (b), petitioner avers that there

19  was not "substantial evidence" presented to the jury pursuant to the instruction that it had to "find

20  that the commission of robbery, unlawful homicide, witness intimidation and/or mayhem was a

21  primary activity of the group, " that is, "that these crimes were consistently and repeatedly

22  committed by the group" to support the "necessary primary activities finding."  Petition, p. 5.

23          Because the petition for review received a postcard denial by the state

24  supreme court, i.e., that court did not offer an explanation of its reasoning, the undersigned

25  "looks through" to the opinion of the state court of appeal, "the last reasoned decision."  Ylst v.

26  Nunnemaker, 501 U.S. 797, 803-804, 111 S. Ct. 2590, 2594-2595 (1991).  The state appellate

court[5] addressed this claim in its unpublished decision, as follows:

> [Cal. Penal Code] Section 186.22, subdivision (b)(1), provides for a sentencing enhancement when defendant "is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members."  Gang enhancements were found true on each count of robbery as to both defendants.  Defendants raise several challenges to the sufficiency of the evidence to support the jury's finding on these enhancements.

> ### A. Evidence of Primary Activities

> Defendants claim there was insufficient evidence that one of the Nogales Gangster Crips's primary activities was the commission of offenses enumerated in the gang statute. We reach a contrary conclusion.

> To establish the existence of a criminal street gang, there must be proof that one of the gang's primary activities is the commission of criminal acts enumerated in the gang statute. (§ 186.22, subd. (e).) The 25 enumerated offenses in section 186.22 include robbery (subd. (e)(2)), unlawful homicide (subd. (e)(3)) and mayhem (subd. (e)(16)).

> "Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 324, 109 Cal.Rptr.2d 851, 27 P.3d 739 ( *Sengpadychith* ).) A gang's primary activity also may be established through expert testimony. ( *Ibid.*) In making its determination, a jury may consider "prior conduct or acts committed at the time of the charged offenses." ( *People v. Galvan* (1998) 68 Cal.App.4th 1135, 1140, 80 Cal.Rptr.2d 853; accord, *Sengpadychith*, at p. 323, 109 Cal.Rptr.2d 851, 27 P.3d 739.)

> Here, Officer Gracia testified that one of the goals of the Nogales Gangster Crips was "to enhance the fear of them in the community." Gracia testified the robberies would further this goal. And a reasonable inference could be made that the two prior gang offenses described by Gracia-a mayhem and a murder-were committed with a similar purpose. Based on this evidence, the jury could determine that the way in which the Nogales Gangster Crips accomplished their goal of instilling fear in the community was by committing offenses enumerated in the gang statute. (See *People v.*

---

[5] Petitioner and his co-defendant, his brother, Henry Hill, who received the same sentence, brought the appeal.  People v. Hill, 2005 WL 1534292, at * 1.

*Duran* (2002) 97 Cal.App.4th 1448, 1464-1465, 119 Cal.Rptr.2d 272 ( *Duran* ) [sufficient evidence of primary activities requirement based on testimony that " 'gang's primary activity was 'putting fear into the community,' "and that they committed various statutorily enumerated offenses toward this end.) Gracia's testimony that she had investigated approximately 15 other offenses enumerated in the gang statute that were committed by members of the Nogales Gangster Crips was substantial evidence that members of this gang "consistently and repeatedly have committed criminal activity listed in the gang statute." (*Sengpadychith*, *supra*, 26 Cal.4th at p. 324, 109 Cal.Rptr.2d 851, 27 P.3d 739, italics omitted.)

Defendants claim that Officer Gracia only testified about "two crimes that were committed by [Nogales Gangster Crips] members, neither of which was established as a 'primary activity.' ["] However, the gang statute does not require that one particular enumerated offense be established as a gang's primary activity. It is sufficient if the evidence establishes that the gang's members "consistently and repeatedly have committed criminal activity listed in the gang statute." ( *Sengpadychith*, *supra*, 26 Cal.4th at p. 324, 109 Cal. Rptr.2d 851, 27 P.3d 739, italics omitted.) Thus, a combination of different offenses specified in the statute suffices as long as such conduct constitutes a primary activity of the gang.

A claim of insufficient evidence does not warrant reversal "unless it appears ' "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].[" ' "]  ( *Duran*, *supra*, 97 Cal.App.4th at p. 1457, 119 Cal.Rptr.2d 272.) We conclude there was sufficient evidence for the jury to infer that a primary activity of the Nogales Gangster Crips was committing offenses enumerated in the gang statute.

People v. Hill, 2005 WL 1534292, at *6-7 [emphasis in original].

In Sengpadychith, supra, 26 Cal.4th at 323, the California Supreme Court, citing

Cal. Penal Code § 186.22(f) (with emphasis added by that court), set forth the STEP Act's[6]

definition of a criminal street gang as:

any ongoing organization, association, or group of three or more persons, whether formal or informal, *having as one of its primary activities the commission of one or more of [ certain enumerated] criminal acts* ..., having a common name or common identifying sign or symbol, and whose members individually or collectively

---

[6]  The California Street Terrorism Enforcement and Prevention (STEP) Act is set forth in Cal. Pen. Code § 186.20 et seq.

engage in or have engaged in a pattern of criminal gang activity."

The California Supreme Court made additional comments regarding how to establish the "primary activities" of a criminal street gang:

Nothing in this statutory language prohibits the trier of fact from considering the circumstances of the *present* or charged offense in deciding whether the group has as one of its primary activities the commission of one or more of the statutorily listed crimes.

Evidence of past or present conduct by gang members involving the commission of one or more of the statutorily enumerated crimes is relevant in determining the group's primary activities. Both past and present offenses have some tendency in reason to show the group's primary activity (see Evid. Code § 210) and therefore fall within the general rule of admissibility (id., § 351). Insofar as the Court of Appeal's decision in In re Elodio O., supra, 56 Cal.App.4th 1175, allowed evidence only of past offenses, we disapprove it.

As we just discussed, evidence of either past or present criminal acts listed in subdivision (e) of section 186.22 is admissible to establish the statutorily required primary activities of the alleged criminal street gang. Would such evidence alone be sufficient to prove the group's primary activities? Not necessarily. The phrase "primary activities," as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's "chief" or "principal" occupations. (See Webster's Internat. Dict. (2d ed. 1942) p. 1963 [defining "primary"].) That definition would necessarily exclude the occasional commission of those crimes by the group's members. As the Court of Appeal cautioned in *People v. Gamez* (1991) 235 Cal.App.3d 957, 970-971 [286 Cal.Rptr. 894], disapproved on another point in *Gardeley, supra*, 14 Cal.4th 605, 624, footnote 10: "Though members of the Los Angeles Police Department may commit an enumerated offense while on duty, the commission of crime is not a primary activity of the department. Section 186.22...requires that one of the primary activities of the group or association itself be the commission of [specified] crime[s] ...Similarly, environmental activists or any other group engaged in civil disobedience could not be considered a criminal street gang under the statutory definition unless one of the primary activities of the group was the commission of one of the [25] enumerated crimes found within the statute."

Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity, listed in the gang statute. Also sufficient might be expert testimony, as occurred in *Gardeley, supra*, 14 Cal.4th 605. There, a police gang expert testified that

the gang of which defendant Gardeley had for nine years been a member was primarily engaged in the sale of narcotics and witness intimidation, both statutorily enumerated felonies.  (See § 186.22, subd. (e)(4) & (8).)  The gang expert based his opinion on conversations he had with Gardeley and fellow gang members, and on "his personal investigations of hundreds of crimes committed by gang members," together with information from colleagues in his own police department and other law enforcement agencies.  (Gardeley, supra, at p. 620.)

Sengpadychith, supra, 26 Cal.4th at 323-324 [emphasis in original]*.

As discussed by the California Supreme Court in Sengpadychith, in People v. Gardeley,14 Cal.4th 605, 59 Cal.Rptr.2d 356 (1997), the California Supreme Court found that testimony of a police gang expert could be sufficient evidence of "primary activity":

Detective Boyd's testimony also provided much of the evidence necessary to establish that the Family Crip gang met the STEP Act's definition of a "criminal street gang..."  (§186.22, subd. (f) [defining a criminal street gang as an "ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more" criminal acts enumerated in subdivision (e) of the statute, and which has a "common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity."].)

Boyd testified that defendants Gardeley and Thompson admitted to membership in the Family Crips, and that Gardeley had been a member of the gang since 1983.  Boyd also expressed his expert opinion that the primary activity of the Family Crip gang was the sale of narcotics, but that the gang also engaged in witness intimidation.  (These are two of the offenses enumerated in subdivision (e) of section 186.22.)  Boyd based this opinion of conversations with the defendants and with other Family Crip members, his personal investigations of hundreds of crimes committed by gang members, as well as information from his colleagues and various law enforcement agencies.

14 Cal.4th at p. 619-620, 59 Cal.Rptr. at 365.

As set forth by the California Court of Appeals, Officer Gracia in the instant matter provided police gang expert testimony at petitioner's trial:

Laura Gracia, a Sacramento police officer, testified as an expert on North Sacramento "Black gangs." Officer Gracia testified about a mayhem offense that occurred in 1996, in which defendants'

brother Kenny, a member of the Nogales Gangster Crips, "t[ook] a bite out of" a suspected rival gang member's face. Gracia had also investigated a homicide committed in 2000 by three members of the Nogales Gangster Crips against an individual associated with a rival gang. In addition to these offenses, Gracia had investigated "[p]robably" 15 offenses enumerated in the gang statute that were committed by members of the Nogales Gangster Crips. (See § 186.22, subd. (e)(1)-(25).)

Officer Gracia interviewed Davis after his arrest. Davis told Gracia that both Herman and Henry were members of the Nogales Gangster Crips. Joe Williams, another validated member of the Nogales Gangster Crips, had also reported that both defendants were members of the Nogales Gangster Crips. In addition, defendants had been identified in the company of other members of the Nogales Gangster Crips. Based on this information and the fact that the robberies were "gang-related," defendants' membership in the Nogales Gangster Crips had been "validated," a procedure utilized by law enforcement in which gang membership is determined based on specified criteria.

Officer Gracia testified that gang members gained status by being violent and "ruthless," thereby enhancing the reputation of the member and the gang. According to Gracia, one of the goals of the Nogales Gangster Crips was "to enhance the fear of them in the community." When asked whether the robberies furthered the interests of the Nogales Gangster Crips, Gracia testified that the robberies would enhance the gang's reputation for violence, which would prevent witnesses and other gang members from reporting the gang's criminal activity.

People v. Hill, 2005 WL 1534292, at *3-4.

Police Detective Laura Gracia was qualified by the court as an expert in North Sacramento area ethnic black gangs.  RT 897-898.[7]  As respondent observes (Answer, pp. 21-22[8]), Detective Gracia testified that the Nogales Gangster Crips (NGC) had been a criminal street gang since the mid-1990's; that the predicate criminal offenses establishing NGC as a criminal street gang included a 1996 mayhem conviction of a validated NGC member, Kenny Hill (petitioner's older brother), involving an assault by Kenny Hill and other NGC members on

---

[7] And see claim 6, infra.

[8] The court's electronic pagination is referenced.

14

Orlandus McMurray, "a suspected blood" (or rival gang member),[9] wherein K.  Hill took a bite

out of McMurray's face, as well as juvenile convictions for a May, 2000, incident between NGC

gang members and individuals associated with the Del Paso Height Bloods, involving an assault

with a deadly weapon by a validated NGC member, named Rashawn Hensley[10] (husband of

petitioner's sister, Sherry Hill),[11] and for homicide involving two other validated NGC members,

Tavaris Nguyen and Durel Foster, for the death of Hector Rosales.  RT 919-925, 1057, 1067,

1071-1072, 1074-1075, 1137-1138, 1159-1162, 1164, 1168-1169.  Moreover, Gracia testified

that she had investigated "a variety of different crimes...involving Nogales Gangster Crips,"

estimating, as noted in the excerpt of the Third DCA opinion above, that she had done such NGC

investigations that would fall within the relevant Penal Code section (i.e., § 186.22(e))[12]

"[p]robably another fifteen times."  RT 1057-1058.  Gracia testified that there were eight

different criteria set forth by the police department by which an individual can be evaluated by a

gang investigator to determine if he is a gang member and that meeting two of those criteria will

result in a person's being considered validated as a gang member; among the criteria are whether

or not a person admits he is a gang member; whether he is tattooed with a known gang tattoo or

dresses in a gang color; whether or not he is frequently in the company of other validated gang

members; whether written correspondence he sends or receives while in custody has telltale

---

[9] Defense counsel on cross-examination sought to elicit testimony from Det. Gracia that tended to undermine the conclusion as to one of the identified predicate offenses that Kenny Hill's assault on Orlandis McMurray (or McMurry) was gang-related involving as it did Hill's anger over his own child referring to McMurray as "daddy" and gaining her admission that she had not sought to determine whether McMurray was a validated gang member.  RT 1137-1138.  On the other hand, Gracia also testified that a witness indicated that as K. Hill and another Crip left the scene of the attack on McMurray, "as they're leaving the scene...they're throwing up criminal gang signs and shouting out, This is Nogalis."  RT 1159.

[10] Also occasionally spelled as "Roswan Henly."  RT 1109.

[11] RT 1109, and see RT 1287.

[12] Although since January, 2007, there have 33 offenses enumerated within Cal. Penal Code § 186.22(e), at the time of the crimes at issue herein the included offenses numbered 25.

1    indicators; whether or not the individual has participated in gang-related crimes as enumerated

2    under Cal. Penal Code § 186.22; whether two members of the same gang say that another person

3    is also a member; whether or not photographs show a person posing with their gang signs thrown

4    up.  RT 1058-1062.  She testified that the armed robberies at issue herein were qualifying

5    criminal street gang crimes and testified as to the process and criteria by which she validated

6    petitioner, his co-defendant (and brother), Henry Hill, and Jessie Davis, as NGC members.  RT

7    1062, 1064-1068, 1070, 1077-1078, 1086, 1090-1092, 1098, 1103-1104, 1109, 1112, 1128-1129,

8    1141.

9                  Specifically, with respect to petitioner, Gracia stated that she had validated him as

10   a member of NGC based on three of the criteria set forth above: that he was involved in a gang-

11   related crime; that he was identified as being "in the company of other identified gang members,"

12   both during the crimes at issue in this petition, as well as by way of additional police contacts;

13   that he was identified by two or more NGC gang members, Jessie Davis and Joe Williams, as a

14   member of their gang.  RT 1077-1078, 1112.  Gracia, the police gang expert, also offered her

15   opinion that, like the previous mayhem and murder identified as gang-related, the instant

16   robberies would promote the goal of enhancing and bolstering the reputation of the NGC for

17   violence, induce fear and serve to intimidate potential witnesses, including other gang members,

18   from providing information about the crimes.  RT 1158-1162.  Although Gracia testified under

19   cross-examination that she was not aware of witness intimidation in this case, she did "seem to

20   recall" reading a police interview transcript wherein Jessie Davis indicated that he had been

21   threatened by either petitioner or his brother after a court proceeding.  RT 1130.[13]  It was also

22   before the jury that Gracia had conceded that Jessie Davis had lied at least at the outset of his

23   interviews with police, including herself.  RT 1131.

24   _____

25         [13] Respondent references (Answer, p. 22) the transcript of the police interview of Jessie
     Davis, wherein Davis tells the interviewing detectives that it was Henry Hill who had hit him
26   after they were arrested. Augmented CT 219-220.

1    Further evidence provided to the jury came from Jesse Davis, who, when asked at

2  what point he realized that being an NGC member would involve him in criminal activity,

3  replied "[a] couple of days after I got jumped in."  RT 601-602, 604.   He expressed fear of being

4  hurt or killed, even in jail, by members of the NGC because he would be labeled a "snitch."  RT

5  607-609, 615, 619-620, 748-749.  He testified that he had told a detective that Henry Hill

6  (petitioner's co-defendant), after court while in a jail cell, had "socked me in my face and said,

7  Why you talking to the police and stuff, you snitch, dead homie delango (ph), I'm going to have

8  everyone kill you in the pen."  RT 618-619.  Davis testified that he understood the expression

9  "putting in work for the gang" to mean "robbing stores, doing drive-bys on other rival gang

10  members and stuff like that."  RT 666.  When Davis at first denied that he was being pressured to

11  "put in work for the gang," the prosecutor read from the transcript of a police interview where

12  Davis admitted that he had been "scared, nervous" about committing the robberies but had been

13  pressured by petitioner and his brother to do the robberies.  RT 666-667 (ref. Aug. CT 154).

14  When his response to his February, 2002 police interview was read back to him, Jessie Davis

15  conceded that he had earlier affirmed his understanding that both Henry and Herman (petitioner

16  herein) could tell him what to do, and if he did not do what he was told, they could call others up

17  to shoot him up or shoot up his house.  RT 665 (ref. Aug. CT 166).

18    While as set forth in the state appellate court opinion, Jessie Davis testified at the

19  trial that he did not believe petitioner was a member of the NGC, it is also true that Davis'

20  statement in the police interview were read back??  In any event, respondent (Answer, p. 22) is

21  correct that the evidence presented was constitutionally sufficient and that a jury could

22  reasonably have concluded that one of the NGC's primary activities was the commission of

23  offenses enumerated in the criminal gang statute.

24    Petitioner further maintains that the evidence was insufficient to show that he

25  committed the robberies "with the required specific intent to promote, further or assist in

26  criminal conduct by the group's members."  Petition, p. 5.  In support of this contention,

17

1  petitioner argues that no evidence was presented: that he knew the others involved in the charged

2  robberies were gang members; or that "gang names were called out or gang graffiti placed at or

3  around the robbed stores during or after the robberies"; or that gang clothing was worn during the

4  robberies.  Id.

5  In rejecting this claim, the state appellate court reasoned as follows:

6  Herman claims there was insufficient evidence that his
   participation in the offenses involved a specific intent "to promote,
7  further, or assist in any criminal conduct by gang members," a
   requirement under the gang enhancement. (§ 186.22, subd .(b)(1).)
8  Not so. Herman had been validated as a member of the Nogales
   Gangster Crips. Both Henry and Davis were also validated
9  members of this gang. This, combined with Davis's testimony,
   established that Herman knowingly assisted gang members to
10  commit two robberies by driving his accomplices to commit the
   offenses. "[D]efendant's intentional acts, when combined with his
11  knowledge that those acts would assist crimes by fellow gang
   members, afforded sufficient evidence of the requisite specific
12  intent." ( *People v. Morales* (2003) 112 Cal.App.4th 1176,
   1198-1199, 5 Cal.Rptr.3d 615 ( *Morales* ).)

13
   During oral argument, Herman cited *Garcia v. Carey* (2005) 395
14  F.3d 1099 as authority that the gang enhancement applies only if
   the charged offense was committed with the specific intent to assist
15  other criminal conduct by gang members. It is true that, in *Garcia*,
   the court affirmed the district court's granting of habeas relief as to
16  the gang enhancement because the record did not " 'support an
   inference that [the defendant] robbed [the victim] in order to
17  facilitate other gang related criminal operations within [the
   community].' " ( *Id.* at p. 1103.) We note, however, that "
18  '[f]ederal decisional authority is neither binding nor controlling in
   matters involving state law.' " ( *Nagel v. Twin Laboratories, Inc.*
19  (2003) 109 Cal.App.4th 39, 55, 134 Cal.Rptr.2d 420.) We do not
   find the reasoning in *Garcia* persuasive.

20
   There is no requirement in section 186.22, subdivision (b), that the
21  defendant's intent to assist criminal endeavors by gang members
   must relate to criminal activity apart from the offense being
22  committed. To the contrary, the specific intent required by the
   statute is "to promote, further, or assist in *any* criminal conduct by
23  gang members." (§ 186.22, subd. (b), italics added.) Accordingly,
   the appellate court in *Morales, supra*, 112 Cal.App.4th at pages
24  1198-1199, 5 Cal.Rptr.3d 615, held there was sufficient evidence
   of the requisite intent where the defendant intended to commit the
25  charged crimes in association with individuals he knew were gang
   members. Accordingly, we reject Herman's argument that proof
26  beyond this was required in his case.

18

1   People v. Hill, 2005 WL 1534292, at * 7.

2           In Garcia v. Carey, 395 F.3d 1099, 1103 (9th Cir. 2005),[14] cited above and rejected

3   by the state appellate court, something which this court is not at liberty to do, the Ninth Circuit

4   panel found that while there was evidence that Garcia was a gang member who had robbed his

5   victim on gang turf and that a gang expert had testified that the gang was turf-oriented, there was

6   no evidence to indicate the "robbery was committed with the specific purpose of furthering gang

7   criminal activity, and there is nothing inherent in the robbery that would indicate that it furthers

8   some other crime."  The Garcia Court found the expert testimony to have been "singularly silent

9   on what criminal activity of the gang was intended or furthered by the robbery...."  Id.   Such is

10  not the case here, where the gang expert, Det. Gracia, testified that gangs generally engage in the

11  same types of crimes, that more junior gang members may be required to commit crimes at the

12  behest of older ones, that gang members gain respect and status in their gang by committing

13  violent acts, that a gang's reputation is enhanced if a gang member is involved in violent crimes

14  because it makes people more fearful of gang reprisals and less likely to testify against a gang

15  member, that failure to abide by a gang's "code of ethics" can result in violence against a

16  member or his family, that a goal of NGC members is to enhance the community's fear of them.

17  RT 903-905, 907-908, 1162.  She testified that rival gang members had informed her that to be a

18  recognized NGC member, one had to shoot or shoot at someone, information that was confirmed

19  by an NGC member to her.  RT 1163-1164.  Jessie Davis testified Henry Hill gave Jessie the gun

20  and that petitioner drove the car with his brother, Henry, and Jessie to the sites of both robberies

21  and Henry instructed Jessie to shoot during both robbery incidents, and specifically told him

22  before the second robbery to shoot someone, which Jessie knew he had to do to earn a "stripe."

23  RT 558, 560, 564-565, 576, 579-580, 675.  As noted by the state court of appeal (see below),

24

25          [14] The court does note that in Garcia, supra, the Ninth Circuit appears to be directly at
    odds with California's state appellate courts' interpretation of state law.  People v. Martinez, 158
    Cal. App. 4th 1324, 1332, 70 Cal. Rptr.3rd  680, 686 (Cal. App.4th Dist.  Jan. 15, 2008), citing
26  People v. Morales , supra,112 Cal.App.4th 1176, 1179, 1198, 5 Cal.Rptr.3d 615.

gunfire was involved at the scene of the both robberies, and in the second, the victim was actually shot, even though no resistance was offered at either location.  Jessie testified that within a couple of days of having been "jumped in," that he knew he would be involved in criminal gang activity, having heard gang members talk about criminal gang activities.  Answer, p. 23, citing RT 602-603.  Jessie also testified that he was a relatively new member of NGC at the time at issue ("couple of months"), a BG or "baby gangster," that petitioner's co-defendant brother, Henry Hill, was a more senior member with more authority, a YG (or "young gangster");[15] that the same person who jumped him into the NGC, Andrew Stigall, also introduced Jesse to petitioner and his brother, Henry; that he felt pressured to commit the robberies (although at one point he said he felt the pressure specifically from Henry, he later conceded that he felt pressure from both petitioner and Henry); that he had been threatened by Henry when he had previously failed to beat up someone for NGC; that a member of NGC earned stripes, or respect, by committing murder and robbery.  RT 588-590, 593-596, 599, 666-668, 674.  In combination with the gang expert witness's testimony, this court finds that the evidence was sufficient for a jury to have reasonably have concluded that the robberies were committed with the requisite specific intent to promote, further or assist in criminal conduct by the group's members.

Petitioner also maintains that there was insufficient evidence that the charged robberies were committed "for the benefit of, at the direction of, or in association with the group," and that the gang expert's testimony on this issue was "generalized speculation" unsupported by evidence.  Petition, p. 5.

To this claim, the state appellate court stated:

Herman also claims there was insufficient evidence that the robberies were committed "for the benefit of, at the direction of or in association with a criminal street gang" because Officer Gracia's opinion in this regard was "highly speculative." We disagree.

---

[15] Jessie testified that an OG, or "old gangster" had the most status, while a BG had the least.  RT 667-668.

> "[W]hether and how a crime was committed to benefit or promote a gang" is an appropriate subject for expert testimony. ( *People v. Killebrew* (2002) 103 Cal.App.4th 644, 657, 126 Cal.Rptr.2d 876 ( *Killebrew* ), and cases cited therein.) Officer Gracia testified the robberies furthered the interests of the Nogales Gangster Crips because they enhanced the gang's reputation for violence, which served to prevent witnesses and other gang members from reporting the gang's criminal activity.
>
> Additional evidence corroborated Officer Gracia's opinion. Immediately prior to the robberies, Henry instructed Davis to "pull one shot" or to "shoot one of the people." If the goal of the robberies was only to obtain money, there would have been no reason for deciding in advance to fire the gun or to shoot someone. The fact that Davis shot the gun during both robberies despite the lack of resistance from either victim was corroboration of Gracia's opinion that the offenses were committed to enhance the gang's reputation for violence and to silence potential witnesses.

People v. Hill, 2005 WL 1534292, at * 8.

Viewing the evidence in the light most favorable to the verdict, and for the reasons described by the California Court of Appeal, the undersigned concludes that there was sufficient evidence from which a rational trier of fact could have found beyond a reasonable doubt that petitioner committed the robberies "for the benefit of, at the direction of, or in association with" NGC members and that the gang expert's testimony on this issue was appropriate.  As explained by the state appellate court, Jessie Davis corroborated the opinion testimony of the police expert Gracia, by testifying that he had been instructed prior to the robberies to shoot his weapon unrelated to whether or not he obtained the money.  The state court opinion rejecting petitioner's arguments in this regard is a reasonable construction of the evidence in this case and is not contrary to or an objectively unreasonable application of federal law.  See Woodford v. Visciotti, 537 U.S. 19, 25, 123 S. Ct. 357, 360 2002); see also 28 U.S.C. § 2254(d)(1).  Accordingly, petitioner is not entitled to habeas relief on his claim that the evidence introduced at his trial was insufficient to support the gang enhancements.

\\\\\

\\\\\

1    Claim 2- *Violation of due process when trial court failed to define "primary
2  activities" as that term is used in the gang enhancement statute*

3    *Legal Standard for Jury Instruction Error*

4    A challenge to jury instructions does not generally state a federal constitutional
5  claim.  See <u>Gutierrez v. Griggs</u>, 695 F.2d 1195, 1197 (9th Cir. 1983); <u>see also</u> <u>Middleton v.</u>
6  <u>Cupp</u>, 768 F.2d 1083, 1085 (9th Cir. 1985).  Habeas corpus is unavailable for alleged error in the
7  interpretation or application of state law.  <u>Estelle v. McGuire</u>, 502 U.S. 62, 112 S. Ct. 475
8  (1981); <u>see also</u> <u>Lincoln v. Sunn</u>, 807 F.2d 805, 814 (9th Cir. 1987); <u>Givens v. Housewright</u>, 786
9  F.2d 1378, 1381 (9th Cir. 1986).  The standard of review for a federal habeas court "is limited to
10 deciding whether a conviction violated the Constitution, laws, or treaties of the United States
11 (citations omitted)."  <u>Estelle v. McGuire</u>, 502 U.S. at 68, 112 S. Ct. at 480.  In order for error in
12 the state trial proceedings to reach the level of a due process violation, the error had to be one
13 involving "fundamental fairness."  <u>Id.</u> at 73, 112 S. Ct. at 482.  The Supreme Court has defined
14 the category of infractions that violate fundamental fairness very narrowly.  <u>Id.</u> at 73, 112 S. Ct.
15 at 482.

16    In order to warrant federal habeas relief, a challenged jury instruction "cannot be
17 merely 'undesirable, erroneous, or even "universally condemned,"' but must violate some due
18 process right guaranteed by the fourteenth amendment."  <u>Prantil v. California</u>, 843 F.2d 314, 317
19 (1988), quoting <u>Cupp v. Naughten</u>, 414 U.S. 141, 146, 94 S. Ct. 396, 400 (1973).  To prevail on
20 such a claim petitioner must demonstrate "that an erroneous instruction 'so infected the entire
21 trial that the resulting conviction violates due process.'"  <u>Prantil</u>, 843 F.2d at 317, quoting <u>Darnell</u>
22 <u>v. Swinney</u>, 823 F.2d 299, 301 (9th Cir. 1987).  <u>See also</u> <u>Estelle</u>, 502 U.S. at 72, 112 S. Ct. 475.
23 In making its determination, this court must evaluate the challenged jury instructions "'in the
24 context of the overall charge to the jury as a component of the entire trial process.'"  <u>Prantil</u>, 843
25 F.2d at 817, quoting <u>Bashor v. Risley</u>, 730 F.2d 1228, 1239 (9th Cir. 1984).  Where the challenge
26 is to a refusal or failure to give an instruction, the petitioner's burden is "especially heavy,"

1   because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a

2   misstatement of the law." Henderson v. Kibbe, 431 U.S. 145, 155, 97 S. Ct. 1730, 1737 (1977).

3   See also Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997).

4                          *Analysis*

5              Petitioner asserts that the trial court instructed the jury that the group must have as

6   one of its primary activities the commission of one or more of the crimes listed.  Petition, p. 7.

7   But, petitioner avers, the trial court "entirely failed" to define the "technical term 'primary

8   activities'" as applied in the gang enhancement statute, and also failed to delineate the type of

9   proof that would be necessary to establish primary activities.  Id.

10             As noted by respondent (Answer, pp. 27-28), the following jury instruction, in

11  relevant part, was given:

12              Defendant is accused in the information with having violated
                Section 186.22(b) of the Penal Code. Any person who is convicted
13              of a felony which is committed for the benefit of, at the direction
                of, or in association with any criminal street gang, with specific
14              intent to promote, further, or assist in any criminal conduct by gang
                members, is guilty of a violation of Section 186.22(g) of the Penal
15              Code.

16              A criminal street gang means any ongoing organization,
                association, or a group of three or more persons, whether formal or
17              informal, having as one of its primary activities the commission of
                one or more of the following criminal acts:
18
                One, robbery, as defined in Penal Code Section 211. . . .
19
                Two, mayhem as defined in Penal Code Section 203. . . .
20
                Three, homicide or murder as defined in Penal Code 187. . . .
21
                Four, the intimidation of witnesses and victims as defined in Penal
22              Code Section 136.1. . . .

23  RT 1692-1694.[16]

24  \\\\\

25  _____

26       [16] Respondent's citation to the Clerk's Transcript (CT 106) *appears to be erroneous.

                                          23

The state court of appeal rejected this claim, as follows:

Herman argues that the trial court committed prejudicial error by failing to instruct the jury regarding the meaning of the phrase "primary activities" contained in the gang statute. (§ 186.22, subd. (f); CALJIC No. 17.24.2.) We disagree.

" 'When a word or phrase "is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law, the court is not required to give an instruction as to its meaning in the absence of a request." [Citations.] A word or phrase having a technical, legal meaning requiring clarification by the court is one that has a definition that *differs* from its nonlegal meaning. [Citation.] Thus, ... terms are held to require clarification by the trial court when their statutory definition differs from the meaning that might be ascribed to the same terms in common parlance. [Citation.] However, absent a request, the court has no duty to define terms which are commonly understood by those familiar with the English language." ( *People v. Woodward* (2004) 116 Cal.App.4th 821, 841, 10 Cal.Rptr.3d 779 .)

Here, the trial court gave a special jury instruction that to constitute a *criminal street gang*, a gang must have as one of its *primary activities* the commission of one or more specified criminal acts. (§ 186.22, subd. (b), italics added.)  Herman maintains the trial court also was required to instruct the jury specifically on the meaning of the term "primary activities," claiming the term "does not have a plain, unambiguous meaning," but rather a "technical meaning" in light of *Sengpadychith*, *supra,* 26 Cal.4th 216. (See *CALJIC No. 17.24.2.*)

To the contrary, the California Supreme Court has ascribed to the term "primary activities" its commonly understood meaning, not a technical definition peculiar to the law. In fact, the high court relied on the definition of "primary" in Webster's International Dictionary in describing the meaning of the term. ( *Sengpadychith*, *supra*, 26 Cal.4th at p. 323, 109 Cal.Rptr.2d 851, 27 P.3d 739.) As the term "primary activities," as used in the gang statute, does not have a meaning that differs from its nonlegal meaning, the trial court was not required to provide further instruction to the jury regarding the significance of this term. Herman did not request the trial court to give additional instructions in this regard.

Herman also claims the instruction was deficient because it did not advise the jury that the occasional commission of the listed offenses was insufficient. (See *Sengpadychith*, *supra*, 26 Cal.4th at p. 323, 109 Cal.Rptr.2d 851, 27 P.3d 739.)  However, the term "primary activity," as commonly understood, "would necessarily exclude" activities engaged in only occasionally. ( *Ibid*.)

24

1       In addition, Herman argues that the instruction should have
2   "inform[ed] the jury that the evidence regarding the past and
   present enumerated crimes was not necessarily sufficient to prove
   the primary activities element." Herman relies on the California
3   Supreme Court's decision in *Sengpadychith*, which noted that
   evidence of past and present offenses was "[n]ot necessarily"
4   sufficient because the evidence must establish that commission of
   statutorily enumerated offenses is one of the group's " 'principal' "
5   activities. ( *Sengpadychith*, *supra*, 26 Cal.4th at p. 323, 109
   Cal.Rptr.2d 851, 27 P.3d 739.) But here the special instruction to
6   the jury stated that the commission of the specified offenses must
   be a "primary activity" of the gang. This was sufficient to convey
7   the amount of activity necessary to sustain a finding on the
   enhancement. (See *People v. Ward* (1999) 71 Cal.App.4th 368,
8   375-376, 83 Cal.Rptr.2d 828.)

9       Finally, Herman contends the jury should have been instructed
   "that evidence of consistent and repeated commission of these
10  crimes was necessary, or, absent that, expert opinion testimony
   establishing the gang's primary activities" was required. It is true
11  that, in *Sengpadychith*, the Supreme Court stated that a jury
   "might" rely on expert testimony or evidence of the consistent and
12  repeated commission of enumerated offenses in determining
   whether a gang's primary activities fell within the gang statute;
13  however, the court did not suggest that a jury should be instructed
   on what type of evidence it could consider in making its
14  determination. (*Sengpadychith*, *supra*, 26 Cal.4th at p. 324, 109
   Cal.Rptr.2d 851, 27 P.3d 739.)

15      For the foregoing reasons, we conclude the jury instruction on
16  primary activities (§ 186.22, subd. (f)) was adequate.

17  People v. Hill, 2005 WL 1534292, at *13-15.

18      As both the state appellate court (above) and respondent observed (Answer, p.

19  29), petitioner did not request that the court give an instruction defining "primary activities."

20  The record does not show that there was ever a request by the jury to define the phrase. Nor does

21  petitioner demonstrate how he was prejudiced by the court's failure to give such an instruction.

22  See People v. Frederick, 142 Cal.App.4th 400, 420, 48 Cal. Rptr.3d 585 (Cal. App. 2nd Dist.

23  2006), finding that the phrases "pattern of related felony conduct," and "related felonies" are

24  "commonly understood without further definition," citing People v. Bland, 28 Cal.4th 313, 334,

25  121 Cal. Rptr. 2nd 546 (2002). In Bland, 28 Cal.4th at 334, the state supreme court stated that

26  "[a] court has no sua sponte duty to define terms that are commonly understood by those familiar

1    with the English language, but it does have a duty to define terms that have a technical meaning

2    peculiar to the law."  In Sengpadycith, quoted at length, infra, (and as noted by the state

3    appellate court above) the court cites the second edition of Webster's International Dictionary in

4    defining "primary" with reference to the phrase "primary activities," not a law dictionary, as

5    there is plainly no inherently "technical meaning peculiar to the law" in that phrase:

6             The phrase "primary activities," as used in the gang statute, implies
                  that the commission of one or more of the statutorily enumerated
7                 crimes is one of the group's "chief" or "principal" occupations.
                  (See Webster's Internat. Dict. (2d ed. 1942) p. 1963 [defining
8                 "primary"].

9    26 Cal.4th at 323.

10            Moreover, in federal court in this circuit:

11             Whether a term in a jury instruction requires definition normally
                  turns on whether it expresses a concept within the jury's ordinary
12                experience. No prejudice results from a district court's failure to
                  define a concept "within the comprehension of the average juror."
13                United States v. Dixon, 201 F.3d 1223, 1231 (9th Cir.2000)
                  (holding that the district court did not err in failing to define
14                "commercial advantage" and "private financial gain" because they
                  are terms within the comprehension of the average juror); see also
15                United States v. Aguilar, 80 F.3d 329, 331 (9th Cir.1996) (en banc)
                  ("[A] district court is not necessarily required to define knowledge
16                for the reason that it is a common word which an average juror can
                  understand and apply without further instruction."); United States
17                v. Moore, 921 F.2d 207, 210 (9th Cir.1990) (holding that the
                  district court did not err in failing to define "violence" because it is
18                a concept within the ordinary experience of the jury); Walker v.
                  Endell, 850 F.2d 470, 475 (9th Cir.1987) ("[C]riminal recklessness
19                under Alaska law relates essentially to the common-sense
                  definition of recklessness, which the average juror could
20                understand and apply without an instruction.").

21   United States v. Tirouda, 394 F.3d 683, 688-689 (9th Cir. 2005).

22            Petitioner simply does not meet his "especially heavy" burden regarding the trial

23   court's "omission, or an incomplete instruction" because such omission "is less likely to be

24   prejudicial than a misstatement of the law."  Henderson v. Kibbe, 431 U.S. ar 155, 97 S. Ct. at

25   1737; Villafuerte v. Stewart, 111 F.3d at 624.  The court finds that petitioner does not

26   demonstrate that the state court decision that his trial court's failure to define "primary

26

1   activities," a phrase composed of language that is commonly understood and within a juror's

2   common experience, rather than one that requires technical legal knowledge, did not render

3   petitioner's trial fundamentally unfair and was not a decision that is contrary to, or an

4   unreasonable application of, established Supreme Court authority.  Nor did the state court's

5   conclusion that the trial court did not violate petitioner's right to due process by not having

6   further defined what type of proof would be necessary to establish "primary activities" constitute

7   a decision that is contrary to, or an unreasonable application of, established Supreme Court

8   authority.  This claim should be denied.

9          Claim 3 - *Trial court violated petitioner's right to due process by*
    *admitting prejudicial and inadmissible gang expert testimony and other gang evidence* &

10         Claim 6 - *Trial court erred in qualifying Officer Gracia as an expert and allowing*
    *her to testify as to legal conclusions*

11

12          In support of his third claim, petitioner contends that the trial court "admitted into

13   evidence massive amounts of irrelevant or only marginally relevant, but highly prejudicial gang

14   evidence," much of which "came in through the testimony of an unqualified police officer using

15   speculation and hearsay."  Petition, p. 8.  Petitioner is singularly unhelpful in making this broad

16   claim, failing to specifically identify in the instant petition what evidence he deems to have been

17   speculation and hearsay by the police gang expert.  In support of the related claim 6, petitioner

18   avers that Officer Gracia should not have been qualified by the court as a gangs expert, alleging

19   that she had "extremely minimal training, unspecialized experience, and no recognized academic

20   or professional credentials in this field."  Id., at 17.  He further claims that Det. Gracia's

21   testimony was largely "vague speculation," and that she was improperly permitted to provide

22   legal conclusions as part of her "expert" opinion.  Id.  Once again, petitioner fails to identify

23   more particularly the basis for the claim.  Petitioner's failure to set forth the specific basis for

24   conclusory allegations in the instant petition are insufficient to establish prejudice.  See Jones v.

25   Gomez, 66 F.3d 199, 204 (9th Cir. 1995) ("'[c]onclusory allegations which are not supported by

26   a statement of specific facts do not warrant habeas relief'") (quoting James v. Borg, 24 F.3d 20,

27

1  26 (9th Cir. 1994)).   Nevertheless, in addition to reviewing the testimony at issue, the court has

2  also reviewed petitioner's opening brief to the state court of appeals, where the specific evidence

3  objected to was more clearly set forth, see respondent's lodged doc. A, and the court finds that

4  the state court comprehensively addressed these claims.   As to claim 6, herein, the state court of

5  appeals provided the following analysis:

6       Defendants raise several claims regarding the testimony of the
        gang expert. For reasons discussed herein, we find no merit to
7       these claims.

8       A. Expert's Qualifications

9       Henry argues it was an abuse of discretion for the trial court to find
        that Officer Gracia qualified as an expert on gangs because she did
10      not have the credentials to testify as an expert. We disagree.

11      "A person is qualified to testify as an expert if he has special
        knowledge, skill, experience, training, or education sufficient to
12      qualify him as an expert on the subject to which his testimony
        relates." (Evid.Code, § 720, subd. (a).) It is within the trial court's
13      discretion to determine whether a witness is competent and
        qualified to render an expert opinion. ( *Huffman v. Lindquist*
14      (1951) 37 Cal.2d 465, 476, 234 P.2d 34.) "Error regarding a
        witness's qualifications as an expert will be found only if the
15      evidence shows that the witness ' " 'clearly lacks qualification as
        an expert.' " ' " ( *People v. Farnam* (2002) 28 Cal.4th 107, 162,
16      121 Cal.Rptr.2d 106, 47 P.3d 988, italics omitted.)

17      Officer Gracia testified to her qualifications as follows: She had
        been a law enforcement officer for 21 years and was part of a
18      seven-member gang unit; she received between four and eight
        hours of gang training at the police academy and completed a
19      40-hour course on gangs when she joined the gang unit; she
        attended gang conferences, taught gang classes at law enforcement
20      academies, assisted in updating training materials and attended
        monthly meetings with gang experts at the district attorney's
21      office; she interviewed 150 gang members in her first 12 years of
        law enforcement work and had worked on "[a] lot" of gang-related
22      cases as an investigator; and she spent up to 75 percent of her time
        on gang cases. Gracia's assignment within the gang unit was North
23      Sacramento Black gangs. She had qualified to testify as an expert
        on these gangs 10 to 15 times.
24
25      We discern no abuse of discretion in the trial court's ruling that
        Officer Gracia was qualified to testify as an expert on North
        Sacramento Black gangs. Contrary to Henry's suggestion, there is
26      no requirement that a witness possess an "academic or professional

credential" to qualify as an expert. For example, in *People v. Ochoa* (2001) 26 Cal.4th 398, 438, 110 Cal.Rptr.2d 324, 28 P.3d 78, the California Supreme Court held there was no abuse of discretion in permitting a detective to testify as an expert concerning the significance of a tattoo, when the detective's expertise was based on his training on gangs at the police academy, his attendance at a gang awareness school and his investigation of street gangs "for most of the past 11 years and all of the past seven." Officer Gracia's training and experience was similar, but more extensive.

Henry also argues that since there were no tattoos, graffiti or gang signs requiring special expertise to interpret, an expert opinion was unnecessary. However, an expert opinion may be given on any subject sufficiently beyond common experience that the opinion would assist the trier of fact. (Evid.Code, § 801, subd. (a).) Gang culture and habits, which are relevant in cases in which a gang enhancement is alleged, are matters not within the common knowledge of a jury and, therefore, are a proper subject for expert testimony. ( *People v. Gardeley* (1996) 14 Cal.4th 605, 617, 59 Cal.Rptr.2d 356, 927 P.2d 713 ( *Gardeley* ).) As defendants were charged with gang enhancements here, expert testimony was relevant.

B. Expert Testimony on Legal Conclusions

Henry claims the trial court erred in allowing Officer Gracia to testify to "legal conclusions." He is incorrect.

As noted previously, an expert may testify to an opinion on a subject sufficiently beyond common experience that the opinion would assist the trier of fact. (Evid.Code, § 801, subd. (a).) And "[t]estimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact." (Evid.Code, § 805.)

Henry objects to testimony by Officer Gracia that the Nogales Gangster Crips had been considered a criminal street gang "since [the] mid-nineties." Henry did not object at trial that this constituted an improper legal conclusion, and his "standing objection" prior to trial to gang expert testimony did not preserve the issue. (Evid.Code, § 353, subd. (a); *People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1208, 105 Cal.Rptr.2d 187; see *People v. Valdez* (1997) 58 Cal.App.4th 494, 505, 68 Cal.Rptr.2d 135 ( *Valdez* ).) In any case, following Gracia's testimony in this regard, she provided the basis for her opinion, describing offenses committed by members of the Nogales Gangster Crips beginning in 1996.

Similarly, Henry's claim regarding Officer Gracia's testimony that the robberies enhanced the reputation of the gang also fails because

he did not raise a proper objection at trial. Furthermore, opinion testimony about "whether and how a crime was committed to benefit or promote a gang" is an appropriate subject for expert testimony. ( *Killebrew*, *supra*, 103 Cal.App.4th at p. 657, 126 Cal.Rptr.2d 876, and cases cited therein.)

Henry also objects to Officer Gracia's testimony regarding "the legal definition of mayhem." Henry does not elaborate on why Gracia's general description of the crime of mayhem, given as a prelude to describing an offense committed previously by a Nogales Gangster Crips member, was improper. Furthermore, the trial court instructed the jury on the definition of mayhem, and it was not disputed that the conduct in question constituted that offense.

Finally, Henry claims Officer Gracia had no factual basis for her opinion that defendants were members of the Nogales Gangster Crips. This claim, too, is without merit. Gang membership is a subject on which expert testimony may be offered. ( *Killebrew*, *supra*, 103 Cal.App.4th at p. 657, 126 Cal.Rptr.2d 876, and cases cited therein.) And, contrary to Henry's claim, Gracia's opinion was based on more than defendants' involvement in the charged offenses. Defendants had been identified by two other members of the Nogales Gangster Crips as members of that gang and had been seen in the company of members of the gang, in addition to their participation with a member of the gang in the charged offenses.

Henry's reliance on *Killebrew* is misplaced. In that case, the appellate court held that an expert's opinion on gang membership should have been excluded because it was based on incompetent hearsay consisting of accusations and suspicion of criminal activity. ( *Killebrew*, *supra*, 103 Cal.App.4th at p. 659, 126 Cal.Rptr.2d 876.) Here, Officer Gracia did not rely on rumored criminal activity in forming her opinion that defendants were members of the Nogales Gangster Crips. Accordingly, we reject Henry's claim.

C. Evidence Code Section 352 Objections

Defendants claim the gang expert's testimony on numerous issues was prejudicial and not highly probative. We conclude any error was harmless.

Under Evidence Code section 352, the trial court has discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will ... create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "[E]vidence is probative if it is material, relevant, and necessary." ( *People v. Thompson* (1980) 27 Cal.3d 303, 318, fn. 20, 165 Cal.Rptr. 289, 611 P.2d 883.) "Prejudice for purposes of Evidence Code section 352 means evidence that tends

to evoke an emotional bias against the defendant with very little effect on issues...." ( *People v. Crew* (2003) 31 Cal.4th 822, 842, 3 Cal.Rptr.3d 733, 74 P.3d 820.)

Gang evidence is admissible " 'only when it [i]s logically relevant to some material issue in the particular prosecution other than as character trait evidence.' " ( *People v. Ruiz* (1998) 62 Cal.App.4th 234, 240, 72 Cal.Rptr.2d 572.) "The admission of gang evidence over an Evidence Code section 352 objection will not be disturbed on appeal unless the trial court's decision exceeds the bounds of reason." ( *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1369, 37 Cal.Rptr.2d 596.)

It is indisputable that gang evidence was relevant here, as defendants were charged with an enhancement alleging they committed the robberies for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1).)  Thus, evidence concerning gang culture was relevant to the extent it supported Officer Gracia's expertise in the area or bore on the elements of the gang enhancement.

Much of the testimony objected to by defendants was offered in support of Officer Gracia's qualifications as an expert. Gracia's credibility as an expert was highly relevant to the jury's determination of the weight to give her testimony. Thus, for example, Gracia testified about the types of gang offenses she had investigated, including spousal abuse, robberies, felonious assaults and homicides. She explained that individual gangs tended "to split or splinter off along racial lines" and that she specialized in "Black gangs" in North Sacramento. Gracia testified that alliances between gangs shift, that conflicts arise and that graffiti can be interpreted to indicate problems between gangs. According to Gracia, a conflict between gangs, which can arise "[s]ometimes ... over a woman, sometimes ... over drug territory, sometimes ... [due to] wearing the wrong color in the wrong place," can lead to a "turf war." The trial court appropriately found such testimony to be foundational in establishing Gracia's expertise to testify about gang culture.

Defendants object to the admission of testimony by Officer Gracia that lying for fellow gang members is part of the gang culture and that gang members or citizens who inform on gang members are subject to retaliation. This evidence was relevant to explain why Davis had initially implicated "Kenny and Edward" instead of defendants. It also was relevant to explain why civilian witnesses, such as Lor and Newrider, backed off from statements they had made to law enforcement officers when they testified at trial. Gracia's testimony regarding instances in which threats had been made to the families of informants and to inmates who have informed on gang members was relevant for the same reason. This testimony was highly probative to explain the conflicting statements of these crucial witnesses, and the trial court acted

within its broad discretion in admitting this evidence under Evidence Code section 352.

Henry also complains that Officer Gracia's testimony in this regard was based on hearsay from unidentified inmates and officers. But "[e]xpert testimony may be founded on material that is not admitted into evidence and on evidence that is ordinarily inadmissible, such as hearsay, as long as the material is reliable and of a type reasonably relied upon by experts in the particular field in forming opinions." (*Duran, supra*, 97 Cal.App.4th at p. 1463, 119 Cal.Rptr.2d 272, citing *Gardeley, supra*, 14 Cal.4th at p. 618, 59 Cal.Rptr.2d 356, 927 P.2d 713.) Gracia explained that her testimony regarding retaliation against inmates was based on her conversations with other officers who had worked in the facilities and with gang members after they had been released from custody, which are acceptable sources on which to base opinions regarding gangs. (*Duran*, at p. 1463, 119 Cal.Rptr.2d 272.) And the extent to which an expert may explain the extrajudicial matters on which she relies in forming her opinions "must generally be left to the trial court's sound judgment." (*Valdez, supra*, 58 Cal.App.4th at p. 510, 68 Cal.Rptr.2d 135.) We detect nothing improper about admitting this testimony.

Henry objects to Officer Gracia's testimony that defendants' matters would not have been prosecuted as "gang case[s]" if she had not validated them as gang members and determined that the offenses were "gang-related." However, this testimony was admitted after testimony was elicited on cross-examination that Gracia had never testified a defendant was not a gang member in a case charged as gang-related. Gracia explained that if she was unable to validate a defendant as a gang member or an offense as gang-related, in all likelihood the matter would not be prosecuted as a gang case and she would not be asked to testify.

Defendants object to Officer Gracia's testimony that the commission of violent crimes by a gang's members enhances the reputation of the gang. Defendants did not object to this testimony at trial, foreclosing them from raising the issue on appeal. (Evid.Code, § 353, subd. (a).) Furthermore, this type of expert testimony regarding gang culture has been held admissible to explain how an offense benefited a gang and as evidence that the specific intent of a defendant was to promote, further or assist criminal conduct by gang members-requirements for establishing the gang enhancement. (§ 186.22, subd. (b)(1); see *Gardeley, supra*, 14 Cal.4th at p. 619, 59 Cal.Rptr.2d 356, 927 P.2d 713.)

Herman complains that Officer Gracia referred to the gang enhancement as the "gang terrorist act." In fact, the chapter containing this and other gang-related statutes is entitled the "Street Terrorism Enforcement and Prevention Act." And, again, defendants did not object at trial to the use of this descriptor.

Defendants also complain about Officer Gracia's testimony that "gangs are mobile." Once again, defendants did not object to this testimony on the grounds now urged and, in any event, the testimony was not particularly prejudicial.

We agree that there was little relevance to some of Officer Gracia's testimony. For example, to explain why she met regularly with gang experts from nearby counties, Gracia testified: "[Q]uite frequently, we have Black gang issues and problems that erupt in Placer County because ... there's a particular bar up there they all congregate at and if something breaks out there, we need to know here in Sacramento because it creates an officer-safety issue for officers in the street and it could be the beginning of a turf war erupting." That Black gangs go to a bar in an adjacent county had little if any relevance to the charges against defendants. Likewise, testimony that rival gang members told Gracia that most of the male Hill children were members of the Nogales Gangster Crips was vague and of little evidentiary value. Gracia also testified that there are 4,000 validated gang members in the City of Sacramento, and that only an estimated 15 to 20 percent of gang members in the greater Sacramento area had been validated. We fail to discern any relevance to this evidence.

Our courts have reviewed the erroneous admission of gang evidence under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 299 P.2d 243; i.e., whether "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." ( *Id*. at p. 836, 299 P.2d 243; see, e.g., *People v. Maestas* (1993) 20 Cal.App.4th 1482, 1498, 25 Cal.Rptr.2d 644.)  Reversal is unwarranted unless "the error or errors complained of resulted in a miscarriage of justice." (Evid.Code, § 353, subd. (b); *Maestas*, at p. 1498, 25 Cal.Rptr.2d 644.)

We conclude no miscarriage of justice resulted here. Officer Gracia's testimony concerning an out-of-county bar frequented by Black gang members was not particularly inflammatory. And since defendants had been identified independently as members of the Nogales Gangster Crips by other members of that gang, the testimony concerning the gang affiliation of the Hill males was cumulative as to defendants.

Officer Gracia's testimony regarding the estimated number of gang members in the Sacramento area is more troubling because it infers a problem of sufficient magnitude to alarm a reasonable juror. However, we conclude it is not reasonably probable that, absent this evidence, a result more favorable to defendants would have been reached. Davis directly implicated defendants in both crimes. His testimony was corroborated in various respects by several witnesses. Defendants, on the other hand, provided multiple explanations as to their whereabouts on the day of the robberies,

33

1      changing their stories when confronted with conflicting evidence.
And, as already discussed, the gang enhancement was amply
2      supported by the evidence. In sum, the evidence against defendants
was compelling. In addition, the testimony as to the number of
3      gang members in the Sacramento area was very brief and was not
referred to in arguments to the jury. We conclude that, under these
4      circumstances, no miscarriage of justice occurred.

5      Herman claims, with little analysis, that the erroneous admission of
irrelevant evidence in this case was a violation of his "right to a
6      fundamentally fair trial as guaranteed by the due process clause" of
the Fourteenth Amendment to the United States Constitution,
7      subject to review under the "harmless beyond a reasonable doubt"
standard reserved for violations of substantial constitutional rights.
8      (See *Chapman, supra*, 386 U.S. at pp. 23-24 [17 L.Ed.2d at pp.
710-711].) We conclude that the admission of the objectionable
9      evidence, which occupied a negligible portion of Officer Gracia's
testimony, did not rise to a level that affected defendants'
10    substantial rights and, therefore, was not subject to this elevated
standard of review.

11

12   <u>People v. Hill</u>, 2005 WL 1534292, at *8-13.

13          *Analysis*

14          The trial record demonstrates that Sacramento City Police Detective Gracia

15  testified at length on voir dire as to her training, experience and familiarity with gangs,

16  particularly black gang groups in North Sacramento, identifying herself as a sworn full-time

17  Sacramento police officer for nineteen years (with two additional preceding years as a reserve

18  officer, for a total of 21 years).  RT 867-882, 895-896.  Detective Gracia testified to having spent

19  four and a half years on patrol, primarily in the North Sacramento area of the city.  RT 868-869.

20  After her years on patrol, she attested to having been promoted to investigator, identifying herself

21  as a detective, and noting that she had had various assignments which involved contact with

22  gang-related activity before being assigned full time to the Gang Unit.  RT 868- 873.  She

23  testified to having received specific training in gangs subculture in the police academy and

24  having attended several gang conferences, both local and international.  RT 876.  As respondent

25  noted (answer, p. 42), Detective Gracia testified that she was teaching at the City Police

26  Department Recruit Academy and at Advanced Officer Training Academy, and the Sheriff's

1  Department Academy; and had participated in updating the statewide training material for the

2  Police Officers Standard and Training; and had given and participated in community forums on

3  gangs.  RT 876, 878, 884.  Detective Gracia, after extensive voir dire, was qualified by the court

4  as an expert within the limited and very circumscribed parameter of North Sacramento area

5  ethnic black gangs, although defense counsel had raised questions about Gracia's lack of

6  academic education (i.e., she had units toward a college degree, but no college or post-graduate

7  degree) or reading of sociology-based gang texts before the jury, made a standing objection,

8  asking in the presence of the jury that objections, raised before the bench outside the jury, based

9  primarily on putatively inflammatory and prejudicial information coming in through "the narrow

10  justification of qualifying Ms. Gracia as a gang expert,"[17] be noted for the record.  RT 885-893,

11  897-898.

12       Prosecutor Detrick: Your Honor, at this time, I would offer Detective Gracia as an
         expert in the North Sacramento area specializing in basically black ethnic gangs.
13
         ...........................................................................................................
14
         Trial court: Based on the limited expertise that Mr. Detrick is seeking to have her
15       qualified a  - - the Court will find that Detective Gracia is an expert with respect
         to the very specific area that Mr. Detrick just offered her.
16

17  RT 897-898.  Gracia testified that she had qualified as an expert on North Sacramento black

18  gangs about ten to fifteen times before.  RT 898.

19       The state appellate court's finding that Det. Gracia qualified as an expert,

20  particularly in light of the specificity of the trial court's ruling, did not violate petitioner's due

21  process rights or deprive him of a fundamentally fair trial.  See, e.g., United States v. Hankey,

22  203 F.3d 1160, 1169 (9th Cir. 2000) (holding that police officers with "years of experience and

23  special knowledge" of gangs may qualify as expert witnesses).  The summary denial of this claim

24  by the California Supreme Court in its summary order denying petitioner's habeas corpus petition

25

26       [17] Counsel for petitioner's co-defendant, Henry Hill, voiced this objection, in which
     petitioner's counsel joined.  RT 887.

1   was not an unreasonable application of clearly established Supreme Court authority.

2          As to petitioner's specific objection to Det. Gracia's having been improperly

3   permitted to testify to legal conclusions, it was petitioner's co-defendant who raised this claim

4   before the state appellate court (see above), although in his petition for review, petitioner sought

5   to join in this argument, incorporating it by reference.  See respondent's lodged doc. I at 48.  In

6   Henry Hill's brief to the state appellate court, co-defendant Henry contended that Det. Gracia's

7   testimony that NGC had been found in the past to be a criminal street gang was a legal

8   conclusion, that she testified as to the legal definition of mayhem, that her testimony that the

9   robberies enhanced NGC's reputation, particularly since shots were fired was testimony on the

10  ultimate issue as whether the crimes were performed for the benefit of the gang.  Lodged Doc. B

11  at 35, citing RT 920, 1158.  Henry contended that Gracia's testimony that a reputation for

12  violence was good for a gang was not based on knowledge derived from actual interviews that

13  NGC's reputation had been enhanced.  Lodged Doc. B at 35.  Henry argued that Det. Gracia's

14  opinion that these were gang crimes committed by gang members was predicated on the ultimate

15  question of their guilt which was to be resolved by the jury.  Id., at 38.  He contended that Gracia

16  testified on these questions without a factual basis.  Id.  These points were each addressed in the

17  last reasoned state court opinion above, accurately reflecting the record, which decision does not

18  constitute an unreasonable application of established Supreme Court authority.  Claim 6 should

19  be denied.

20         As to the related claim 3, that petitioner was deprived of due process by the

21  trial court's admitting prejudicial and inadmissible gang expert testimony and other gang

22  evidence, his opening brief to the state court of appeal, petitioner identifies as "objectionable

23  evidence" (noting objections raised in and outside jury's presence), Gracia's testimony as to

24  domestic violence in gangs generally; about gang-related homicides; about changing alliances,

25  feuds, gang turf wars that could be set off by issues of "respect" or "disrespect," grafitti being

26  crossed out, conflicts over a woman or drug territory, or by just wearing the wrong color in the

wrong place; about her testimony as to gangs involving races and ethnicities other than black

ethnic gangs; as to the number of validated gang members in Sacramento ("over 4000"); as to her

estimate that only fifteen to twenty percent of all Sacramento gang members had been validated;

as to gang mobility; as to the commonality of gang objectives; as to information she had received

from rival Blood gang members that most of the male children of petitioner's family (i.e.,

petitioner and his brothers) being NGC members (over petitioner's Cal. Evid. Code § 352 and

federal objections); as to gang members propensity for lying to protect a fellow gang member; as

to gang threats to "snitches" or informers; as to witness intimidation by gang members and

retaliation for having "snitched"; as to problems in the jail/prison system caused by gangs about

which she had heard from other officers and gang members released from custody.  See Lodged

Doc. A, appellant's opening brief, pp. 55-67, citing RT 870-873, 878-879, 990-881, 887-889,

891-892, 896-898, 900-902, 905-910, 912-919, 926, 928-931, 1079, 1082-1083, 1100, 1104-

1105, 1147-1148, 1157.  Petitioner argued that much of this evidence was erroneously admitted

and prejudicial, inflammatory, irrelevant, and inadmissible hearsay.  Id. at 68-77.  The state

appellate court reasoned as to this claim:

> C. Evidence Code Section 352 Objections
>
> Defendants claim the gang expert's testimony on numerous issues was prejudicial and not highly probative. We conclude any error was harmless.
>
> Under Evidence Code section 352, the trial court has discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will ... create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "[E]vidence is probative if it is material, relevant, and necessary." ( *People v. Thompson* (1980) 27 Cal.3d 303, 318, fn. 20, 165 Cal.Rptr. 289, 611 P.2d 883.) "Prejudice for purposes of Evidence Code section 352 means evidence that tends to evoke an emotional bias against the defendant with very little effect on issues...." ( *People v. Crew* (2003) 31 Cal.4th 822, 842, 3 Cal.Rptr.3d 733, 74 P.3d 820.)
>
> Gang evidence is admissible " 'only when it [i]s logically relevant to some material issue in the particular prosecution other than as character trait evidence.' " ( *People v. Ruiz* (1998) 62 Cal.App.4th

234, 240, 72 Cal.Rptr.2d 572.) "The admission of gang evidence over an Evidence Code section 352 objection will not be disturbed on appeal unless the trial court's decision exceeds the bounds of reason." ( *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1369, 37 Cal.Rptr.2d 596.)

It is indisputable that gang evidence was relevant here, as defendants were charged with an enhancement alleging they committed the robberies for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1).)  Thus, evidence concerning gang culture was relevant to the extent it supported Officer Gracia's expertise in the area or bore on the elements of the gang enhancement.

Much of the testimony objected to by defendants was offered in support of Officer Gracia's qualifications as an expert. Gracia's credibility as an expert was highly relevant to the jury's determination of the weight to give her testimony. Thus, for example, Gracia testified about the types of gang offenses she had investigated, including spousal abuse, robberies, felonious assaults and homicides. She explained that individual gangs tended "to split or splinter off along racial lines" and that she specialized in "Black gangs" in North Sacramento. Gracia testified that alliances between gangs shift, that conflicts arise and that graffiti can be interpreted to indicate problems between gangs. According to Gracia, a conflict between gangs, which can arise "[s]ometimes ... over a woman, sometimes ... over drug territory, sometimes ... [due to] wearing the wrong color in the wrong place," can lead to a "turf war." The trial court appropriately found such testimony to be foundational in establishing Gracia's expertise to testify about gang culture.

Defendants object to the admission of testimony by Officer Gracia that lying for fellow gang members is part of the gang culture and that gang members or citizens who inform on gang members are subject to retaliation. This evidence was relevant to explain why Davis had initially implicated "Kenny and Edward" instead of defendants. It also was relevant to explain why civilian witnesses, such as Lor and Newrider, backed off from statements they had made to law enforcement officers when they testified at trial. Gracia's testimony regarding instances in which threats had been made to the families of informants and to inmates who have informed on gang members was relevant for the same reason. This testimony was highly probative to explain the conflicting statements of these crucial witnesses, and the trial court acted within its broad discretion in admitting this evidence under Evidence Code section 352.

Henry also complains that Officer Gracia's testimony in this regard was based on hearsay from unidentified inmates and officers. But "[e]xpert testimony may be founded on material that is not admitted into evidence and on evidence that is ordinarily

inadmissible, such as hearsay, as long as the material is reliable and of a type reasonably relied upon by experts in the particular field in forming opinions." (*Duran, supra,* 97 Cal.App.4th at p. 1463, 119 Cal.Rptr.2d 272, citing *Gardeley, supra,* 14 Cal.4th at p. 618, 59 Cal.Rptr.2d 356, 927 P.2d 713.)  Gracia explained that her testimony regarding retaliation against inmates was based on her conversations with other officers who had worked in the facilities and with gang members after they had been released from custody, which are acceptable sources on which to base opinions regarding gangs. (*Duran,* at p. 1463, 119 Cal.Rptr.2d 272.) And the extent to which an expert may explain the extrajudicial matters on which she relies in forming her opinions "must generally be left to the trial court's sound judgment." ( *Valdez, supra,* 58 Cal.App.4th at p. 510, 68 Cal.Rptr.2d 135.) We detect nothing improper about admitting this testimony.

Henry objects to Officer Gracia's testimony that defendants' matters would not have been prosecuted as "gang case[s]" if she had not validated them as gang members and determined that the offenses were "gang-related." However, this testimony was admitted after testimony was elicited on cross-examination that Gracia had never testified a defendant was not a gang member in a case charged as gang-related. Gracia explained that if she was unable to validate a defendant as a gang member or an offense as gang-related, in all likelihood the matter would not be prosecuted as a gang case and she would not be asked to testify.

Defendants object to Officer Gracia's testimony that the commission of violent crimes by a gang's members enhances the reputation of the gang. Defendants did not object to this testimony at trial, foreclosing them from raising the issue on appeal. (Evid.Code, § 353, subd. (a).) Furthermore, this type of expert testimony regarding gang culture has been held admissible to explain how an offense benefited a gang and as evidence that the specific intent of a defendant was to promote, further or assist criminal conduct by gang members-requirements for establishing the gang enhancement. (§ 186.22, subd. (b)(1); see *Gardeley, supra*, 14 Cal.4th at p. 619, 59 Cal.Rptr.2d 356, 927 P.2d 713.)

Herman complains that Officer Gracia referred to the gang enhancement as the "gang terrorist act." In fact, the chapter containing this and other gang-related statutes is entitled the "Street Terrorism Enforcement and Prevention Act." And, again, defendants did not object at trial to the use of this descriptor.

Defendants also complain about Officer Gracia's testimony that "gangs are mobile." Once again, defendants did not object to this testimony on the grounds now urged and, in any event, the testimony was not particularly prejudicial.

We agree that there was little relevance to some of Officer Gracia's

testimony. For example, to explain why she met regularly with gang experts from nearby counties, Gracia testified: "[Q]uite frequently, we have Black gang issues and problems that erupt in Placer County because ... there's a particular bar up there they all congregate at and if something breaks out there, we need to know here in Sacramento because it creates an officer-safety issue for officers in the street and it could be the beginning of a turf war erupting." That Black gangs go to a bar in an adjacent county had little if any relevance to the charges against defendants. Likewise, testimony that rival gang members told Gracia that most of the male Hill children were members of the Nogales Gangster Crips was vague and of little evidentiary value. Gracia also testified that there are 4,000 validated gang members in the City of Sacramento, and that only an estimated 15 to 20 percent of gang members in the greater Sacramento area had been validated. We fail to discern any relevance to this evidence.

Our courts have reviewed the erroneous admission of gang evidence under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 299 P.2d 243; i.e., whether "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." ( *Id.* at p. 836, 299 P.2d 243; see, e.g., *People v. Maestas* (1993) 20 Cal.App.4th 1482, 1498, 25 Cal.Rptr.2d 644.)  Reversal is unwarranted unless "the error or errors complained of resulted in a miscarriage of justice." (Evid.Code, § 353, subd. (b); *Maestas*, at p. 1498, 25 Cal.Rptr.2d 644.)

We conclude no miscarriage of justice resulted here. Officer Gracia's testimony concerning an out-of-county bar frequented by Black gang members was not particularly inflammatory. And since defendants had been identified independently as members of the Nogales Gangster Crips by other members of that gang, the testimony concerning the gang affiliation of the Hill males was cumulative as to defendants.

Officer Gracia's testimony regarding the estimated number of gang members in the Sacramento area is more troubling because it infers a problem of sufficient magnitude to alarm a reasonable juror. However, we conclude it is not reasonably probable that, absent this evidence, a result more favorable to defendants would have been reached. Davis directly implicated defendants in both crimes. His testimony was corroborated in various respects by several witnesses. Defendants, on the other hand, provided multiple explanations as to their whereabouts on the day of the robberies, changing their stories when confronted with conflicting evidence. And, as already discussed, the gang enhancement was amply supported by the evidence. In sum, the evidence against defendants was compelling. In addition, the testimony as to the number of gang members in the Sacramento area was very brief and was not referred to in arguments to the jury. We conclude that, under these

1    circumstances, no miscarriage of justice occurred.

2    Herman claims, with little analysis, that the erroneous admission of
     irrelevant evidence in this case was a violation of his "right to a
3    fundamentally fair trial as guaranteed by the due process clause" of
     the Fourteenth Amendment to the United States Constitution,
4    subject to review under the "harmless beyond a reasonable doubt"
     standard reserved for violations of substantial constitutional rights.
5    (See *Chapman*, *supra*, 386 U.S. at pp. 23-24 [17 L.Ed.2d at pp.
     710-711].) We conclude that the admission of the objectionable
6    evidence, which occupied a negligible portion of Officer Gracia's
     testimony, did not rise to a level that affected defendants'
7    substantial rights and, therefore, was not subject to this elevated
     standard of review.

8

9    People v. Hill, 2005 WL 1534292, at *11-13.

10        As the state appellate court noted the trial court permitted Det. Gracia's testimony

11   about her experience with, inter alia, gang-related domestic violence and gang-related homicides,

12   and gang culture as foundational for her qualification as an expert.  As to her testimony based on

13   the hearsay of other officers and other gang members, such a determination is not contrary to

14   established federal law.  See Fed. R. Evid. 703 (which provides that an expert may base her

15   opinion on facts or data "[i]f of a type reasonably relied upon by experts in the particular field"

16   which "need not be admissible in evidence...."); United States v. Hankey, supra, 203 F.3d 1160,

17   1169 (9th Cir. 2000); see also, United States v. Beltran-Rios, 878 F.2d 1208, 1213 n. 3 (9th

18   Cir.1989).

19        The state appellate court's determination that Detective Gracia's testimony

20   regarding gang culture was relevant and admissible was not an unreasonable application of

21   established Supreme Court authority.

22   Windham objects to the admission of the testimony of Detective
     Angel Delgadillo ....  The trial court allowed the prosecution to
23   introduce the testimony of Detective Delgadillo, a member of the
     Sacramento City Police Department Street Gang Unit, as a "gang
24   expert." Detective Delgadillo testified that there were several
     factions of the gangs known as "Crips" and "Bloods" in the area
25   where the crimes took place. Ninety-five percent of these gang
     members are black. Most are male. Detective Delgadillo stated that
26   gangs engage in "paybacks," or retributive behavior, against rival

1    gangs when one of their cohorts is wronged. Detective Delgadillo
2    also testified regarding Woods's membership in the Crips gang.
     While Delgadillo was on the stand, the prosecutor introduced a
3    photo album belonging to Woods which was inscribed "Crip Fo
     Life" and which contained other writings and photos indicating
4    Woods's gang affiliation. No evidence was introduced that
     Windham was a member of the Crips.

5    Windham v. Merkle, 163 F.3d 1092, 1103 (9th Cir. 1998); see also, Kim v. Adams, 281

6    Fed.Appx. 759 (9th Cir. 2008) (*unpublished*)[18](admission of police officer expert testimony as to

7    gang-related behavior at murder trial did not violate petitioner's right to due process).

8         When reviewing alleged violations of state evidentiary rules in a federal habeas

9    proceeding, this court's "role is limited to determining whether the admission of evidence

10   rendered the trial so fundamentally unfair as to violate due process." Windham v. Merkle, 163

11   F.3d 1092, 1103 (9th Cir.1998).  The admission of evidence at trial may violate due process only

12   if "there are *no* permissible inferences the jury may draw from the evidence." Jammal v. Van de

13   Kamp, 926 F.2d 918, 920 (9th Cir.1991) [emphasis in original].

14        Nor was the state court's determination that the evidence it determined to be

15   irrelevant was harmless error constitute an unreasonable application of established Supreme

16   Court authority.

17        Claim 3 should be denied.

18        Claim 4 - *Trial court erred by failing to give a promised limiting instruction*
     *regarding the gang evidence and petitioner was denied effective assistance of counsel by the*
19   *failure to ensure the instruction was given*

20        The legal standard for jury instruction error has previously been set forth (see

21   claim 2, above).

22   \\\\\

23

24        [18] The Ninth Circuit now permits citation to unpublished cases.  Ninth Circuit Rule 36-3,
     in accordance with Fed. R. App. P. 32.1, now permits citation to unpublished dispositions and
25   orders issued on or after January 1, 2007.  However, such rulings "are not precedent, except
     when relevant under the doctrine of law of the case or rules of claim preclusion or issue
26   preclusion."  Ninth Circuit Rule 36-3(a).

*Analysis*

The state appellate court reasoned as to this claim, as follows:

B. Limiting Instruction on Gang Evidence

Herman argues that the trial court erred by failing to provide a limiting instruction concerning the gang expert's testimony. Herman's contention fails because he did not make a timely request for an instruction.

On request, the trial court must instruct the jury as to the limited purpose for which evidence is admitted when such evidence "is inadmissible as to another party or for another purpose." (Evid.Code, § 355.) However, there is no sua sponte duty to give a limiting instruction on gang evidence. ( *People v. Hernandez* (2004) 33 Cal.4th 1040, 1051, 16 Cal.Rptr.3d 880, 94 P.3d 1080 ( *Hernandez* ).)

Henry filed a pretrial motion seeking the exclusion of certain evidence, but he did not mention gang expert testimony specifically. At the pretrial hearing on the motion, both defense counsel lodged a "standing objection" to opinion testimony by the gang expert. In this regard, Henry's attorney stated: "Much of this evidence that normally comes through a gang expert is from other crimes, other events that have nothing to do with this specific factual instance that we are dealing with here nor my specific client. [¶] ... [¶] ... I will make these standing objections to this coming in. I think it's also [Evidence Code section] 1101[, subdivision] (a) evidence, bad character evidence."

The trial court noted that a gang expert's opinion is admissible regarding gang-related issues. The court ruled that evidence of "prior bad acts" relating to the gang enhancement was admissible, but the court reserved discretion to exclude such evidence if it was unduly prejudicial. The court also stated that defense counsel could request a limiting instruction to advise the jury that the prior bad acts were not being admitted to show character or propensity. Defense counsel requested a limiting instruction, which the trial court initially said it would give. However, the prosecutor next advised the court that he did not anticipate presenting evidence of prior bad acts by defendants. The court stated: "You have my ruling in case it gets beyond that. But it appears at this time, then, that issue may not be necessary."

This last statement indicates the trial court understood that defense counsel sought a limiting instruction concerning evidence of prior bad acts by defendants. Defendants did nothing to dispel the court of this notion, remaining silent when the trial court indicated that a limiting instruction may not be necessary based on the prosecutor's representation of the evidence that would be presented. Under

43

1       these circumstances, it was incumbent on defendants to request a
        limiting instruction at the time the evidence in question was
2       presented. They failed to do so.

3       In *Hernandez*, our Supreme Court held that the trial court was not
        required to give a limiting instruction when the issue was raised
4       before the trial court had ruled on the admissibility of gang expert
        testimony and an instruction was not requested "at the appropriate
5       time." (*Hernandez, supra*, 33 Cal.4th at p. 1052, 16 Cal.Rptr.3d
        880, 94 P.3d 1080.) The circumstances here are the same.
6       Although defendants objected generally to gang expert testimony at
        a pretrial hearing and requested a limiting instruction, it was not
7       clear at that time whether the gang expert's testimony would
        require a limiting instruction. Defense counsel did not request a
8       limiting instruction during Officer Gracia's testimony or thereafter.
        Again, the trial court did not have a sua sponte duty to give a
9       limiting instruction without a specific request at the appropriate
        time.
10
        Herman asserts that a sua sponte instruction was required because
11      "'unprotested evidence ... [wa]s a dominant part of the evidence
        against the accused, and [wa]s both highly prejudicial and
12      minimally relevant to any legitimate purpose.' " (*Hernandez,
        supra*, 33 Cal.4th at pp. 1051-1052, 16 Cal.Rptr.3d 880, 94 P.3d
13      1080.) He is mistaken. Most of the gang-related evidence "was
        relevant to the gang enhancement, which was a legitimate purpose
14      for the jury to consider it." ( *Id.* at p. 1052, 16 Cal.Rptr.3d 880, 94
        P.3d 1080.) As previously discussed, the small portion of evidence
15      that should have been excluded was not a dominant part of the
        evidence against defendants. Accordingly, there was no sua sponte
16      duty to give the jury a limiting instruction. ( *Ibid.*)

17  People v. Hill, 2005 WL 1534292, at *15-16.

18                      *Analysis*

19          In support of this claim that the trial court promised to give a limiting instruction

20  to prevent gang evidence to be used as character or propensity evidence, but failed to do so,

21  resulting in prejudicial error (petition, p. 10, citing RT 33-34), petitioner must show that the

22  omission "'so infected the entire trial that the resulting conviction violates due process.'" Prantil,

23  supra, 843 F.2d at 317; see also, Estelle, 502 U.S. at 72, 112 S. Ct. at 482.   In addition, as

24  previously noted, the petitioner's burden is "especially heavy," because "[a]n omission, or an

25  incomplete instruction, is less likely to be prejudicial than a misstatement of the law."

26  Henderson v. Kibbe, 431 U.S. at 155, 97 S. Ct. at 1737.  The court's review of the record

                                44

1    demonstrates that petitioner does not meet his burden.

2              Petitioner makes reference to the trial judge's comments during the

3    period when the court was considering and ruling on motions in limine:

4              But the people can introduce prior bad acts to prove a relevant fact
               other than character to prove the elements of the gang allegation as
5              charged under Penal Code Section 186.22(b).

6              Also, Mr. Johansson and Mr. Farina can make the request. I am
               prepared to give the jury limiting instruction that these prior bad
7              acts are not admitted under- - are not being admitted to show
               character or propensity, but they are simply being admitted to
8              prove the elements of the gang allegation as set forth in the
               186.22(b), that is for that purpose and not for any other purpose.
9              That's up to you if you make that request, I am happy.

10             Mr. Johansson: I will make that request now, your Honor.

11             Mr. Farina: I would join in that request.

12             The Court: All right. Then I will give them such a limiting
               instruction with respect to that.
13             ................................................

14             Mr. Detrick [prosecutor]: I don't anticipate at this point presenting
               prior bad acts of these specific defendants as part of the predicate
15             acts. And counsel has discovery of the events that I do intend to
               use those predicate acts, so I don't think there will be a whole lot
16             of fight in that issue.

17             The Court: All right. Fine. You have my ruling in case it gets
               beyond that. But it appears at this time, then, that issue may not be
18             necessary.

19   RT 33-34.

20             As set forth in the state Court of Appeal opinion, the record shows that the trial

21   judge, after having given the referenced promise, appears to have understood the limiting

22   instruction sought by the defense as going to any prior bad acts of the defendants being

23   introduced and appears to have been assuaged by the prosecutor's comments that introduction of

24   such evidence was not his intent.

25             Petitioner's counsel joined in a pretrial motion standing objection made by

26   Henry's counsel, pursuant to Cal. Evid. Code § 352, positing that he sought "to federalize" the

1  objection on grounds of procedural due process as well, that the gang expert's anticipated

2  testimony would be more prejudicial than probative.  RT 16.  The court ruled that the gang expert

3  testimony would be admissible to show the elements as required by Cal. Penal Code § 186.22(b)

4  so long as those requirements were met: "that there are two or more predicate acts, certain

5  crimes, and so forth, all the requirements that are there," while the trial judge also asserted that

6  such evidence would be subject to the discretion he retained under Cal. Evid. Code § 352, RT 35-

7  36.  As noted previously, defense counsel posited "352 1101a" objections to the gang expert

8  testimony again outside the jury's presence after Det. Gracia was called to testify, and the court

9  again ruled the testimony admissible, stating that it would listen to any defense objections while

10  Det. Gracia testify, should she get "too far afield...." RT 887-889.

11          In discussion with counsel about jury instructions when the prosecutor asked the

12  judge in relation to what evidence he intended to give CALJIC 2.09, the judge stated: "I think it

13  had to do with some of the evidence towards Detective Gracia, that it wasn't coming in for the

14  truth of the matter asserted, but it was coming in for another purpose."  RT 1656-1657.  During

15  the following brief colloquy, the court indicated that he recalled a time that, upon petitioner's co-

16  defendant's counsel's objection during Gracia's testimony that the prosecutor had given an

17  exception for after which the judge instructed the jury that the testimony was coming in not for

18  the truth asserted, but for another reason.  RT 1657.  The court confessed to not recalling the

19  instance more specifically and also stated that it might be that the jury also might not remember.

20  RT 1657.  While this court's review of Gracia's testimony does not reveal such an occasion,

21  defense counsel for either party did not object to the reading of CALJIC 2.09 as follows:

22              [C]ertain evidence was admitted for a limited purpose.  At the time
             this evidence was admitted you were instructed that it could not be
23              considered by you for any other purpose other than the limited
             purpose for which it was admitted.
24
             Do not consider this evidence for any purpose except the limited
25              purpose than the limited purpose for which it was admitted.

26  RT 1656-1657, 1675.

46

1    The court notes that, under Federal Rules of Evidence (Fed. R. Civ. 404(b)),

2    where on appeal reversing a decision is not burdened with the AEDPA gloss, it is not reversible

3    error for a trial court not to give a limiting instruction sua sponte concerning admission of other

4    criminal acts evidence.  United States v. Multi-Management, Inc., 743 F.2d 1359, 1364-1365 (9th

5    Cir. 1984) ("It is well-settled that where no limiting instruction is requested concerning evidence

6    of other criminal acts, the failure of the trial court to give such an instruction sua sponte is not

7    reversible error.") [Internal citations omitted.]

8    The state appellate court's reasoning, finding that the trial judge did not have sua

9    sponte duty to give a limiting instruction specifically as to the gang evidence was not an

10   unreasonable application of established Supreme Court authority.

11   *Standards for Ineffective Assistance of Counsel*

12   The test for demonstrating ineffective assistance of counsel is set forth in

13   Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984).  First, a petitioner must show

14   that, considering all the circumstances, counsel's performance fell below an objective standard of

15   reasonableness.  Strickland, 466 U.S. at 688, 104 S. Ct. at 2065.  To this end, the petitioner must

16   identify the acts or omissions that are alleged not to have been the result of reasonable

17   professional judgment.  Id. at 690, 104 S. Ct. at 2066.  The federal court must then determine

18   whether in light of all the circumstances, the identified acts or omissions were outside the wide

19   range of professional competent assistance.  Id., 104 S. Ct. at 2066.  "We strongly presume that

20   counsel's conduct was within the wide range of reasonable assistance, and that he exercised

21   acceptable professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d

22   695, 702 (9th Cir. 1990) (citing Strickland at 466 U.S. at 689, 104 S. Ct. at 2065).

23   Second, a petitioner must affirmatively prove prejudice.  Strickland, 466 U.S. at

24   693, 104 S. Ct. at 2067.  Prejudice is found where "there is a reasonable probability that, but for

25   counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at

26   694, 104 S. Ct. at 2068.  A reasonable probability is "a probability sufficient to undermine

1  confidence in the outcome." Id., 104 S. Ct. at 2068.

2          In extraordinary cases, ineffective assistance of counsel claims are evaluated

3  based on a fundamental fairness standard.  Williams v. Taylor , 529 U.S. 362, 391-93, 120 S. Ct.

4  1495, 1512-13 (2000), (citing Lockhart v. Fretwell, 113 S. Ct. 838, 506 U.S. 364 (1993)).

5          The Supreme Court has recently emphasized the importance of giving deference

6  to trial counsel's decisions, especially in the AEDPA context:

7          In Strickland we said that "[j]udicial scrutiny of a counsel's
           performance must be highly deferential" and that "every effort
8          [must] be made to eliminate the distorting effects of hindsight, to
           reconstruct the circumstances of counsel's challenged conduct, and
9          to evaluate the conduct from counsel's perspective at the time."
           466 U.S., at 689, 104 S.Ct. 2052.  Thus, even when a court is
10         presented with an ineffective-assistance claim not subject to §
           2254(d)(1) deference, a [petitioner] must overcome the
11         "presumption that, under the circumstances, the challenged action
           'might be considered sound trial strategy.'"  Ibid. (quoting Michel
12         v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).

13         For [petitioner] to succeed, however, he must do more than show
           that he would have satisfied Strickland's test if his claim were
14         being analyzed in the first instance, because under § 2254(d)(1), it
           is not enough to convince a federal habeas court that, in its
15         independent judgment, the state-court decision applied Strickland
           incorrectly.  See Williams, supra, at 411, 65 S. Ct. 363.  Rather, he
16         must show that the [ ]Court of Appeals applied Strickland to the
           facts of his case in an objectively unreasonable manner.

17

18  Bell v. Cone, 535 U.S. 685, 698-699, 122 S. Ct. 1843,1852 (2002).

19         Petitioner has conflated his claim with regard to the failure of the trial court to

20  give a limiting instruction sua sponte with a claim for ineffective assistance of counsel for having

21  failed to ensure that such an instruction was given.

22         The state appellate court ruled as follows as to the ineffective assistance

23  of counsel contention:

24         As an alternative claim, Herman asserts his trial attorney rendered
           ineffective assistance of counsel by failing to renew the request for
25         a limiting instruction at the proper time. To establish this claim,
           defendants must show " 'that counsel's performance was deficient
26         ... [and] that, absent counsel's error, it is reasonably probable that

48

the verdict would have been more favorable to him.' " (*Hernandez,
supra,* 33 Cal.4th at pp. 1052-1053, 16 Cal.Rptr.3d 880, 94 P.3d
1080.) If the record does not disclose why counsel failed to act, we
must reject the contention unless there could be no satisfactory
explanation. ( *Id.* at p. 1053, 16 Cal.Rptr.3d 880, 94 P.3d 1080;
*People v. Scott* (1997) 15 Cal.4th 1188, 1212, 65 Cal.Rptr.2d 240,
939 P.2d 354.)

Here, it is certainly possible that a reasonable attorney would have
concluded there was more to lose from emphasizing the gang
evidence in a jury instruction highlighting how such evidence
could and could not be used. (See *Hernandez, supra,* 33 Cal.4th at
p. 1053, 16 Cal.Rptr.3d 880, 94 P.3d 1080.) Moreover, it is not
reasonably probable that results more favorable to defendants
would have resulted had a limiting instruction been given. The
prosecutor did not imply or argue that the evidence could be used
to establish bad character or criminal propensity. In fact, little
emphasis was placed on the gang evidence during arguments to the
jury. We conclude that a limiting instruction "would not have
significantly aided defendants under these facts or weakened the
strength of the evidence of guilt the jury properly could have
considered." (*Id.* at p. 1054, 16 Cal.Rptr.3d 880, 94 P.3d 1080.)

People v. Hill, 2005 WL 1534292, at *16.

In this case, not only did the jury have before it the testimony of the gang expert

with extensive cross-examination by both petitioner's defense counsel and Henry's defense

counsel, but, inter alia, the testimony of Jessie Davis; the testimony of Detective Marc Hensley,

attesting to, among other matters, Henry's changing version of where he and petitioner were on

the date in question; the testimony of Officer Bradley Chew (RT 1201-1210) as to petitioner's

own conflicting stories as to his activities on the day of the robberies.  Moreover, defense

counsel's cross-examination of Det. Gracia was rigorous; petitioner's counsel pointedly

challenged Gracia's method of validating petitioner as a gang member, likely raising questions in

the jurors' minds.  RT 1108-1144.

In light of the record in this case, petitioner does not meet even the first prong

under Strickland, that is, he does not demonstrate his counsel's performance fell below an

objective standard of reasonableness by failing to insist on or renew a request for a limiting

instruction with regard to the gang evidence testimony.  Strickland, 466 U.S. at 688, 104 S. Ct. at

1   2065.  The state appellate court's analysis that it would be reasonable for an attorney to conclude

2   that there would be more to lose than to gain by an emphasis on the gang evidence in a limiting

3   jury instruction and that it there was not a reasonable probability that there would have been

4   more favorable results for petitioner had such an instruction been given is not an unreasonable

5   application of established Supreme Court authority.  This claim should be denied in its entirety.

6          Claim 5 - *Trial court committed prejudicial error and violated petitioner's right*
           *to due process and trial by jury under the Fourteenth Amendment by including*
7          *witness intimidation as one of the predicate offenses in the gang enhancement*
           *instructions given to the jury, and petitioner was denied effective assistance of*
8          *counsel when counsel failed to object to the instruction*

9          As previously noted, to prevail on a claim of jury instruction error, petitioner must

10  demonstrate "that an erroneous instruction 'so infected the entire trial that the resulting conviction

11  violates due process.'"  Prantil, 843 F.2d at 317, quoting Darnell v. Swinney, 823 F.2d 299, 301

12  (9th Cir. 1987).  See also Estelle, 502 U.S. at 72, 112 S. Ct. 475.  In making its determination,

13  this court must evaluate the challenged jury instructions "'in the context of the overall charge to

14  the jury as a component of the entire trial process.'"  Prantil, 843 F.2d at 817, quoting Bashor v.

15  Risley, 730 F.2d 1228, 1239 (9th Cir. 1984).

16         No party disputes petitioner's assertion that in giving the gang enhancement jury

17  instruction, the trial court included witness intimidation as one of the predicate offenses.

18  Petition, p. 17, citing CT [Augmented] 106, 110.  Nor does respondent dispute petitioner's

19  assertion that witness intimidation should not have been included as a predicate offense because

20  no witness, including Det. Gracia, described witness intimidation as a predicate offense

21  committed by the NGC.  Id.; see also, Answer, pp. 41-42.

22         To place this claim in context, although the court herein has previously set forth

23  this instruction in part, the undersigned will include it more fully herein, as read to the jury:

24         Defendant is accused in the information with having violated Section 186.22(b) of
           the Penal Code.  Any person who is convicted of a felony which is committed for
25         the benefit of, at the direction of, or in association with any criminal street gang,
           with specific intent to promote, further, or assist in any criminal conduct by gang
26         members, is guilty of a violation of Section 186.22(g) of the Penal Code.

50

A criminal street gang means any ongoing organization, association, or a group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the following criminal acts:

One, robbery, as defined in Penal Code Section 211. And momentarily, ladies and gentlemen, I'll read to you the definition of robbery. So I will provide you with that.

Two, mayhem as defined in Penal Code Section 203. I will also provide you momentarily with that definition.

Three, homicide or murder as defined in Penal Code 187. It's similarly, I'll give you the definition for homicide and murder.

Four, the intimidation of witnesses and victims as defined in Penal Code Section 136.1. I will also provide you with the definition of that crime.

Further, in order to be a criminal street gang, it must have a common name, identifying sign or symbol, and its members must individually or collectively engage in or have engaged in a pattern of criminal gang activity.

A pattern of criminal gang activity means the commission, attempted commission, or solicitation of two or more of the above crimes, committed on separate occasions, or by two or more persons. The crimes must have been committed after September 23, 1988, the last of those crimes must have occurred within three years from a prior offense.

In order to prove such a crime, each of the following elements must be proved:

One, a person is convicted of a felony;

Two, the felony was committed by the person for the benefit of, at the direction of, or in association with a criminal street gang;

Three, the person acted with the specific intent to promote, further, or assist in any criminal conduct of the gang.

RT 1692-1693, see also, CT [Aug.] 106.

In providing the promised elements of the offenses set forth as predicate acts, the trial judge stated, as to the crime of witness intimidation:

CALJIC 7.14. Every person who knowingly and maliciously prevents or dissuades or attempts to prevent or dissuade any witness or victim from attending or giving testimony at any trial,

51

1    proceeding, or inquiry authorized by law, making any report of
     such victimization to any peace officer, state, or local law
2    enforcement officer, probation, parole or correctional officer, any
     prosecution agency, or to any judge, causing a complaint,
3    indictment, information, probation or parole violation to be sought
     and prosecuted, and from assisting in the prosecution thereof,
4    arresting or causing or seeking the arrest of any person in
     connection with such victimization is guilty of violation of Penal
5    Code Section 136.1, a crime.

6    It is immaterial whether an attempt to dissuade was successful.
     The fact, if it be a fact, that no person was injured physically or
7    was intimidated is not a defense.

8    RT 1694-1695, see also, CT [Aug.] 110.

9         While conceding that it was error for witness intimidation to be included as a

10   predicate offense in the court's gang enhancement jury instructions, the state appellate court in

11   finding that petitioner, nevertheless, had not been thereby prejudiced, reasoned as follows:

12        C. Inclusion of Witness Intimidation in List of Predicate Offenses

13   Herman claims the trial court's special jury instruction regarding
     the gang enhancement erroneously included the offense of witness
14   intimidation in the list of predicate offenses that could be
     considered in determining whether members of the gang had
15   engaged in a pattern of criminal gang activity. Although we agree
     this was error, we conclude the error was harmless.
16
     Herman contends, and the People concede, that "[c]rimes occurring
17   after the charged offense cannot serve as predicate offenses to
     prove a pattern of criminal gang activity." (*Duran, supra*, 97
18   Cal.App.4th at p. 1458, 119 Cal.Rptr.2d 272.)  Here, the jury was
     instructed correctly that a pattern of criminal gang activity is
19   established by the commission of two or more of the listed
     predicate offenses committed on separate occasions, the last having
20   occurred within three years of a prior offense.  However, the
     special jury instruction included witness intimidation-in addition to
21   robbery, mayhem and murder-as one of the statutorily enumerated
     offenses.
22
     The only evidence of witness intimidation by Nogales Gangster
23   Crips members concerned an assault and threats by Henry against
     Davis occurring after the robbery charges were filed.  Because this
24   conduct occurred after the charged offenses, it could not be
     considered by the jury in whether a pattern of criminal
25   gang activity had been shown. The instruction given to the jury
     improperly allowed them to rely on this conduct in finding a
26   pattern of criminal gang activity.

52

1    Herman maintains the error was prejudicial because it permitted
2    the jury to make a true finding on the gang enhancement on
     insufficient evidence and it is not possible to determine which
3    offenses the jury relied on in finding a pattern of criminal gang
     activity. However, "[o]ne way of finding this kind of error
4    harmless has long been recognized. Sometimes it is possible to
     determine from other portions of the verdict that the jury
5    necessarily found the defendant guilty on a proper theory." (*People
     v. Guiton* (1993) 4 Cal.4th 1116, 1130, 17 Cal.Rptr.2d 365, 847
6    P.2d 45; see *People v. Boyd* (1985) 38 Cal.3d 762, 770, 215
     Cal.Rptr. 1, 700 P.2d 782.)  Such is the case here.

7    The jury found defendants guilty of committing two robberies-i.e.,
     two predicate offenses "committed on separate occasions." (§ 186
8    .22, subd. (e).) Thus, the jury's verdicts necessarily included
     sufficient findings of the requisite pattern of criminal gang activity
9    to support the gang enhancements.

10   Herman also argues that his trial attorney's failure to object to the
     erroneous instruction constituted ineffective assistance of counsel.
11   As we conclude Herman was not prejudiced by the erroneous
     instruction, this claim fails.

12

13   People v. Hill, 2005 WL 1534292, at *16-17.

14          Plainly, the state appellate court is correct in finding that it was error for the trial

15   court to include witness intimidation as a possible predicate offense for a finding of criminal

16   gang activity when the record demonstrates that any evidence for such a crime dated beyond the

17   time of the charged robbery offenses.

18          This is not the situation where the jury is presented two alternative *legal* theories,

19   one of which is valid and the other invalid.  Rather, the jury here was asked to pick one or more

20   *factual* theories, one of which might not have been supported by the evidence, i.e., there was not

21   evidence of pre-charge witness intimidation.  The two situations provide for markedly different

22   end results.  In the former, the Ninth Circuit has held that presenting an invalid legal theory gives

23   rise to a structural error.  See Ho v. Carey, 332 F.3d 587, 595, 506 (9th Cir. 2003).  But see

24   Hedgpweth v. Pulido, __U.S.__, __S.Ct.__, 2008 WL 5055738 (Dec. 2, 2008) applying a Brecht

25   harmless error analysis.  In the latter situation, the one here, as long as there was substantial

26   evidence for the correct factual theory, the existence of one not supported by evidence will not

1    invalidate the verdict.  Griffin V. United States, 502 U.S. 46, 59, 112 S.Ct. 466 (1991).

2               In this case, the state appellate court's determination that the jury's verdict, having

3    found defendants guilty of having committed two predicate offenses, the two separate robberies,

4    must, of necessity, have included sufficient findings of the requisite pattern of criminal gang

5    activity to support the gang enhancements was not an unreasonable application of established

6    Supreme Court authority and this portion of the claim should be denied.

7               As to petitioner's claim that he was denied the effective assistance of counsel by

8    his attorney's failure to object to inclusion of the erroneous jury instruction, even assuming

9    petitioner has met the first Strickland prong, that his counsel was objectively unreasonable in

10   light of all the circumstances and his conduct outside the wide range of reasonable assistance, to

11   fail to object to inclusion of the witness intimidation element of the instruction, id. at 690, 104 S.

12   Ct. at 2066, petitioner must then affirmatively prove prejudice.  Strickland, 466 U.S. at 693, 104

13   S. Ct. at 2067.  As demonstrated above, there was no objective error on which to support a

14   dispositive objection.  The state appellate court's reasoning was not an unreasonable application

15   of established Supreme Court authority.  This portion of claim 5 should also be denied, and the

16   entire claim denied.

17               Claim 7 - *Petitioner denied Sixth Amendment right to counsel at a critical
     stage of the proceedings when the trial court failed to appoint counsel to investigate his claim*
18   *that he was denied effective assistance of counsel at trial as a basis for a new trial motion*

19               Petitioner contends, in support of this claim, that he wanted a new trial because it

20   was his belief that his trial counsel "should have called two additional specific witnesses" (whom

21   he does not actually name within the petition).  Petition, p. 18.  Petitioner avers that the trial court

22   should have treated his pro per (or pro se) new trial motion "as a request for independent counsel

23   to investigate whether a motion for a new trial could be brought on this colorable claim," but

24   failed to do so.  Id.  Petitioner claims the trial court erred when it failed to hold a hearing outside

25   the presence of both his co-defendant and the prosecutor and when it did not consider appointing

26   independent counsel to investigate petitioner's (unspecified) ineffective assistance of counsel

claim. Id. As petitioner, on appeal, joined his co-defendant's argument in support of this claim,

the court has reviewed that argument as set forth in his brother and co-defendant Henry's opening

brief on appeal (wherein, of course, there was no mention of petitioner's needing to have a

hearing held outside of his co-defendant's, but only the prosecutor's, presence.) Respondent's

Lodged Doc. B, pp. 56-62. Therein, Henry's appellate counsel references the June 24, 2002,

hearing on the defense new trial motions, wherein the trial judge mentions having received

Henry's pro se motion, as well as the one filed by petitioner's attorney as well as Henry's defense

counsel; Henry's counsel, Mr. Johannsson, states that while he had not yet received a copy of the

motion, that he was aware of the motion's contents. Id., citing RT 1883-1884, CT 296. Within

the referenced hand-written communication from Henry Hill, Henry claims that he has only

recently learned (by reading law books on his own) that he had the right to take the stand to

testify at his own trial and to bring in his own witnesses. CT 296. He further asserts that he and

petitioner had witnesses with whom their attorneys spoke and from whom they took statements.

Id. Henry writes that Joe Williams was with him when the Asian Market was robbed and told

this to Henry's attorney. Id. He claims that this information was on tape and that Joe "agree

coming in when he was call [sic]...." Id. Henry also contends that Lamount West was a member

of the NGC and continues: "Are [sic] attorney talk to him about us being Nogales Crip he agree

coming in when call to are attorney said: Joe Williams and Lamount West are star witnesses."

Id. Henry concludes with the assertion that his counsel will not tell the court about the witnesses

and finally avers that petitioner "never said in his statement he was at the [A]sian [M]arket." CT

297.

    The gravamen of this claim, although petitioner does not expressly reference

People v. Marsden[19] in his petition, appears to be that the trial judge erred in denying petitioner's

---

[19] In People v. Marsden, 2 Cal.3d 118, 84 Cal. Rptr. 156 (1970), the California Supreme
Court held that a trial court must permit a defendant seeking a substitution of counsel after the
commencement of the prosecution's case to specify the reasons for his request.

1 motion for new trial and, in particular, in failing to conduct a <u>Marsden</u> inquiry to determine

2 whether independent counsel should have been appointed to investigate the claim of ineffective

3 assistance of counsel (for his counsel's failure to call two people as witnesses) and to investigate

4 whether or not a motion for a new trial could proceed on such a claim.

5     Pursuant to California law, a trial court deciding a motion for new trial based on

6 ineffective assistance of trial counsel must proceed in the following fashion when the defendant

7 has requested new counsel for the purpose of arguing the motion:

8    the trial court must initially elicit and fully consider the defendant's
reasons for believing he was ineffectively assisted at trial.  In so
9    doing, the court must make such inquiries of the defendant and
trial counsel as in the circumstances appear pertinent.  If the claim
10    is based upon acts or omissions that occurred at trial or the effect
of which may be evaluated by what occurred at trial the court may
11    rule on the motion for new trial without substituting new counsel.
If, on the other hand, the claim of incompetence relates to acts or
12    omissions that did not occur at trial and cannot fairly be evaluated
by what occurred at trial, then, unless for other good and sufficient
13    reason the court thereupon grants a new trial, the court must
determine whether to substitute new counsel to develop the claim
14    of incompetence.  New counsel must be appointed when the
defendant presents a colorable claim that he was ineffectively
15    represented at trial; that is, if he credibly establishes to the
satisfaction of the court the possibility that trial counsel failed to
16    perform with reasonable diligence and that, as a result, a
determination more favorable to the defendant might have resulted
17    in the absence of counsel's failings.

18 <u>People v. Stewart</u>, 171 Cal.App.3d 388, 396-97 (1985).[20]

19     This court's review of the record indicates that, in rejecting Henry's pro se new

20 trial motion, the state Court of Appeal accurately reflects what transpired at the hearing on

21 Henry's claims.  See RT 1883-1886.

22 \\\\\

23 \\\\\

24 _____

25   [20]  In <u>People v. Smith</u>, 6 Cal.4th 684, 696, 25 Cal. Rptr.2d 122, 200 (1993), The
California Supreme Court disapproved <u>Stewart</u> to the extent it suggested a defendant has a
greater right at the later stage of a trial to substitute counsel under <u>Marsden</u>.  The same standard
26 applies equally pre-conviction and post-conviction.  <u>Id.</u> at 694.

V. New Trial Motion

Defendants contend the trial court erred by failing to appoint new counsel to investigate Henry's new trial motion. They also assert the trial court was required to hold a closed hearing to consider their claims. We reject these contentions.

In addition to new trial motions filed by defendants' attorneys, Henry filed a separate request for a new trial on behalf of Herman and himself. In relevant part, Henry claimed defense counsel had interviewed two individuals-Joe Williams and Lamount West-who he claimed were " 'star witnesses.' " Henry stated, " 'Joe Williams' was with me when the [A]sian [M]arket got rob[bed]." He stated that " 'Lamount West is a Nogales Crip' " and " '[our] attorney talk [ed] to him about us being Nogales Crip." According to Henry, both individuals had agreed to testify.

At the hearing on defendants' new trial motion, the trial court asked defense counsel to respond to Henry's claim that there were witnesses who were not called to testify. Henry's attorney stated he was aware of both witnesses named by Henry but he felt their testimony "would do more damage than good and that the risk, given the state of evidence and the lack thereof, required my not calling them." Herman's attorney added that he had spoken to both witnesses, that Lamount West "probably would have testified that he was a gang member" and that his testimony "would have done our case a lot more damage than [it] would have done any good." Referring to "statements Williams had given to law enforcement and other information," Herman's attorney explained that it was a strategic decision not to call these witnesses to testify.

Henry was allowed to make a statement. He advised the trial court that if Williams and West "came in court ... saying what they had to say, ... it would have helped me out a whole lot in this case." Henry stated that Williams told a defense investigator that he was at the market and that both he and West were willing to testify. He then stated, "That's all I have to say right now."

The trial court ruled that defense counsels' decision not to call the witnesses identified by Henry was based on a reasonable trial strategy.

With these facts in mind, we turn to the relevant law. When a defendant requests the appointment of a new attorney based on alleged inadequate representation, the trial court must inquire as to the reasons for the defendant's request and exercise its discretion in deciding whether to substitute counsel. ( *People v. Mendoza* (2000) 24 Cal.4th 130, 156-157, 99 Cal.Rptr.2d 485, 6 P.3d 150; *People v. Marsden* (1970) 2 Cal.3d 118, 123-125, 84 Cal.Rptr. 156, 465 P.2d 44.)

A claim of ineffectiveness of counsel may be raised in a new trial motion. ( *People v. Smith* (1993) 6 Cal.4th 684, 693, 25 Cal.Rptr.2d 122, 863 P.2d 192 ( *Smith* ).) The standard is the same whether the motion is made before or after trial. ( Id. at p. 696, 25 Cal.Rptr.2d 122, 863 P.2d 192.) "[S]ubstitute counsel should be appointed when, and only when, necessary under the *Marsden* standard, that is whenever, in the exercise of its discretion, the court finds that the defendant has shown that a failure to replace the appointed attorney would substantially impair the right to assistance of counsel." (*Ibid.*)

" 'If the claim of inadequacy relates to courtroom events that the trial court observed, the trial court will generally be able to resolve the new trial motion without appointing new counsel for the defendant. [Citation.] If, on the other hand, the defendant's claim of inadequacy relates to matters that occurred outside the courtroom, and the defendant makes a "colorable claim" of inadequacy of counsel, then the trial court may, in its discretion, appoint new counsel to assist the defendant in moving for a new trial.' " (*Smith*, supra, 6 Cal.4th at pp. 692-693, 25 Cal.Rptr.2d 122, 863 P.2d 192.)

"[A] trial court's duty to permit a defendant to state his reasons for dissatisfaction with his attorney arises when the defendant in some manner moves to discharge his current counsel." (*People v. Lucky* (1988) 45 Cal.3d 259, 281, 247 Cal.Rptr. 1, 753 P.2d 1052.) Although "a proper and formal legal motion" for new counsel is not required, there must be "some clear indication by defendant that he wants a substitute attorney." ( *Ibid.*, fn. 8.)

Here, Henry's request for a new trial was based on complaints that defense counsel failed to call "star witnesses" to testify at trial. Although defendants did not expressly request substitute counsel, Henry's request for a new trial manifested his dissatisfaction with defense counsel and was tantamount to making this request. We conclude his complaints were sufficient to trigger an inquiry into the adequacy of representation, despite the absence of an express request for the appointment of new counsel. (See *People v. Kelley* (1997) 52 Cal.App.4th 568, 580, 60 Cal.Rptr.2d 653; contra *People v. Gay* (1990) 221 Cal.App.3d 1065, 1070, 270 Cal.Rptr. 747.)

However, defendants' contention that they were denied a hearing on Henry's claims is unfounded. Henry filed a written request for a new trial outlining his complaints about defense counsel with sufficient specificity to obviate the need for "a full-blown hearing." ( *People v. Wharton* (1991) 53 Cal.3d 522, 580, 280 Cal.Rptr. 631, 809 P.2d 290.) The trial court inquired of defense counsel regarding the witnesses Henry identified in his written request. The court also provided Henry an opportunity to respond orally without interruption.

And although defendants now complain they were entitled to a hearing outside the presence of the prosecutor, a confidential hearing is not always required. (See *People v. Madrid* (1985) 168 Cal.App.3d 14, 18-19, 213 Cal.Rptr. 813 [*Marsden* motion need not be held in camera, although it is the "better practice" to do so upon request]; *Smith, supra*, 6 Cal.4th at p. 694, 25 Cal.Rptr.2d 122, 863 P.2d 192 [*Marsden* motions are "often" heard outside the presence of the prosecutor so defendant and defense counsel may speak openly].) With the trial completed, there was little cause for concern about revealing trial strategy. And since these matters were the basis for Henry's request for a new trial, the prosecutor had an interest in hearing his complaints.

Nor is there merit to defendants' claim that they were entitled to substitute counsel to assist them in presenting the request for a new trial. As previously stated, defendants were entitled to the appointment of new counsel only if the trial court determined that their right to the assistance of counsel would otherwise be substantially impaired. We conclude the trial court exercised appropriate discretion in declining to appoint new counsel.

Defendants' complaints about counsel were based on their failure to call two witnesses to testify at trial. One of the witnesses identified was Joe Williams, who, according to Henry, would have testified he was with Henry when the Asian Market was robbed. How this would have exculpated either defendant is unclear, since Henry had admitted he went to the market with Herman in Herman's car and that he was in the market when Davis robbed it. Furthermore, testimony at trial established that Williams was a self-avowed member of the Nogales Gangster Crips. He had also identified defendants as members of that gang. Also, according to a pretrial motion filed by Herman's attorney, Williams told a law enforcement detective that he was a passenger in the car that transported Davis and defendants to the robberies. It is difficult to imagine how Williams's testimony could have bolstered defendants' case in any way.

Defendants were no clearer as to how Lamount West might have assisted their cause. According to Henry, West "[wa]s a Nogales Crip' " and defense counsel had "talk[ed] to him about [defendants] being Nogales Crip." Even if, as suggested by this statement, West testified that defendants were not members of the Nogales Gangster Crips, his testimony would have been of little value. He was a member of the gang and, according to the gang expert, gang members are willing to lie and provide false alibis to protect fellow gang members. In any event, gang membership is not an element of the gang enhancement. ( *Valdez, supra*, 58 Cal.App.4th at p. 505, 68 Cal.Rptr.2d 135.)

The trial court was in a position to resolve Henry's request for a new trial without appointing new counsel. (See *Smith, supra*, 6

Cal.4th at pp. 692-693, 25 Cal.Rptr.2d 122, 863 P.2d 192.)
Defendants' claims related to events that occurred both inside and
outside the courtroom. Williams and West had been the subject of
testimony during trial, providing support for counsels' explanation
of why they had chosen not to call these individuals to testify.
Needless to say, the information revealed at trial about these
individuals raised a significant possibility that their testimony
would have been damaging to the defense with little benefit.
Although given the opportunity, Henry provided no information to
militate in favor of a different conclusion.

We conclude the trial court acted well within its discretion in
denying Henry's request for a new trial without appointing new
counsel.

People v. Hill, 2005 WL 1534292, at * 17-20.

The Sixth and Fourteenth Amendments guarantee an individual brought to
criminal trial in state or federal court the right to assistance of counsel. Faretta v. California, 422
U.S. 806, 807, 95 S. Ct. 2525, 2527 (1975). Under Strickland, supra, such assistance must be
effective and competent. A trial is unfair if an accused individual is denied counsel at a critical
stage of his trial. United States v. Cronic, 466 U.S. 648, 659, 104 S. Ct. 2039, 2047 (1984). The
Ninth Circuit has long held that "there can be little question that the motion for a new trial under
California law is a critical stage of the prosecution." Menefield v. Borg, 881 F.2d 696, 699 (9th
Cir. 1989). Thus, criminal defendants are entitled to the assistance of competent counsel at a
motion for a new trial. Jackson v. Ylst, 921 F.2d 882, 888 (9th Cir. 1990) (citing Menefield v.
Borg, 881 F.2d at 699). "Counsel" may be either trial counsel or substitute counsel appointed for
purposes of hearing the new trial motion. Jackson, supra, 881 F.2d at 888. "There is no
automatic right to a substitution of counsel simply because the defendant informs the trial court
that he is dissatisfied with appointed counsel's performance." Id. However, "a trial judge is
required to order a substitution of counsel if, after a hearing, it is demonstrated that there is a
breakdown in the attorney-client relationship or that an actual conflict of interest existed." Id.,
citing Wood v. Georgia, 450 U.S. 261, 273-74, 101 S. Ct. 1097, 1104-1105 (1981). "Holding a
hearing to review a defendant's ... claim insures that the trial is fundamentally fair." Id.

1          Where a defendant is proceeding with the assistance of counsel, he may move to

2    dismiss or substitute counsel, whether appointed or retained.  The grant or denial of such a

3    motion may depend on its timeliness and the nature of the conflict between the defendant and

4    current counsel.  United States v. McClendon, 782 F.2d 785, 789 (9th Cir. 1986).  In assessing a

5    claim that the state trial court erred in denying a request for substitute counsel in the context of a

6    habeas corpus proceeding, "the Sixth Amendment requires on the record an appropriate inquiry

7    into the grounds of such a motion, and that the matter be resolved on the merits before the case

8    goes forward."  Schell v. Witek, 218 F.3d 1017, 1025 (9th Cir. 2000) (en banc).  See also

9    Hudson v. Rushen, 686 F.2d 826, 829 (9th Cir. 1982) ("[T]he state trial court's summary denial

10   of a defendant's motion for new counsel without further inquiry violated the Sixth

11   Amendment.")

12          At the hearing on the new trial motions brought by petitioner's and his co-

13   defendant's counsel, it is clear that the trial judge separately addressed the issues raised by the

14   co-defendant, Henry Hill, pro se (in which this petitioner has joined), giving both counsel for

15   petitioner and for Henry, an opportunity to clarify Henry's pro se motion as well as affording

16   Henry himself an opportunity to speak to his concerns about two "star witnesses" who were not

17   called.  RT 1880-1893.  Petitioner's counsel's (Mr. Farina's) own motion on petitioner's behalf

18   for a new trial focused on an argument that there was insufficient evidence to support the gang

19   enhancement.  At the hearing on the new trial motions, the court noted that Mr. Johansson's own

20   motion on behalf of the co-defendant, Henry Hill, raised a number of issues except the one

21   addressed by Henry pro se.  Mess. Johansson and Farina made clear that they were aware of

22   and/or had spoken with the would-be "star witnesses," and both had determined, for strategic

23   reasons, that these individuals were more likely to damage the case against the defendants than

24   help it.  As noted, Henry also spoke on his own behalf with regard to the motion he brought per

25   se.

26   \\\\\

1          Although petitioner states that he should have been allowed the opportunity to

2    have a hearing outside the prosecutor's hearing, he does not elaborate or adequately set forth

3    what he (or his co-defendant brother) could or would have addressed in such a hearing.  He does

4    not submit any affidavit by either uncalled witness attesting to clarify what either witness might

5    have offered in testimony favorable to petitioner; nor does he demonstrate why the hearing,

6    brought at the conclusion of trial, should necessarily have been conducted outside the

7    prosecution's hearing.  As the state appellate court noted, what was heard about the individuals

8    petitioner believes should have been called at trial does not suggest that they would have been

9    beneficial for him.  See, e.g., RT 1071, 1073, 1076- 1077, where Det. Gracia testified that Joe

10   Williams' name came to her attention during a homicide investigation in 2000; she testified that

11   Williams told her he was a member of the NGC and informed her that petitioner was as well; she

12   testified that Williams was a validated gang member; there was testimony that both Joe Williams

13   and Lamont West's had a version of "NoNo" as an NGC gang moniker; in addition, Lamont

14   West, according to Det. Gracia, was involved with Kenny Hill, petitioner's brother, when Kenny

15   Hill committed the mayhem offense that served as a predicate act for the finding that the NGC

16   qualified as a criminal street gang.  RT 1065, 1159, 1164-1165.

17          Petitioner claims that the trial court should have treated the pro per request for a

18   new trial as a request for independent counsel to investigate his claim and failed to hold a hearing

19   outside the presence of his co-defendant and the prosecutor and failed to consider whether to

20   appoint independent counsel to investigate his ineffective assistance of counsel claim should be

21   denied.  It was, after all, his co-defendant and not petitioner who actually brought the motion;

22   neither petitioner nor his co-defendant asked for new counsel to argue the motion at the time.

23   Henry, the co-defendant, was permitted to speak on behalf of his own motion, at which time he

24   could have sought new counsel, but did not.  Both counsel for Henry and petitioner, as the state

25   appellate court adjudged, clarified that their choice to exclude the putative star witnesses, of

26   whom they were both aware and with whom petitioner's counsel had spoken, was a rational

1    strategic choice.  The record of the hearing on the motion for new trial, accurately reflected in the

2    state court appellate opinion, demonstrates that the court considered the pro per motion.  Further,

3    there is no evidence that petitioner suffered actual prejudice because of any violation of his right

4    to counsel in this context.  In the absence of good cause, petitioner was not entitled to the

5    automatic appointment of substitute counsel for purposes of pursuing a new trial motion.  See

6    Jackson, 921 F.2d at 887 (holding that "there is no automatic right to a substitution of counsel

7    simply because the defendant informs the trial court that he is dissatisfied with appointed

8    counsel's performance").  Put another way, a state court is not automatically required to appoint

9    substitute counsel whenever a motion for a new trial rests upon the alleged incompetence of

10   counsel.[21]

11           The California Court of Appeal concluded that petitioner's counsel did not render

12   ineffective assistance at trial; therefore, under state law, the trial court had no obligation to

13   appoint new counsel for the purpose of arguing the motion for new trial on petitioner's behalf.

14   The court's decision in this regard is not contrary to or an unreasonable application of United

15   States Supreme Court authority.  Accordingly, petitioner is not entitled to relief on this claim.

16           Claim 8 - *Petitioner denied federal constitutional right to a jury trial and
     the court acted in excess of its jurisdiction when petitioner was sentenced to consecutive terms
17   based on facts beyond those found true by the jury under Blakely v. Washington, 542 U.S. 296,
     124 S. Ct. 2531 (2004).*

18

19           Petitioner was sentenced to eighteen (18) years in prison.  As to count one,

20   robbery, under Cal. Penal Code 211, he was sentenced to the low term of two years; as to the

21   arming enhancement, under Cal. Penal Code § 12202(d), he was sentenced to an additional year;

22   as to the conviction under Cal. Penal Code § 186.22(b), an additional ten-year consecutive

23

24           [21]  Cf.  United States v. Del Muro, 87 F.3d 1078, 1080 (9th Cir. 1996) (Sixth Amendment
     violation found where court failed to appoint substitute counsel to pursue motion for new trial
25   placing defendant's lawyer in the untenable position of trying to show his own ineffectiveness at
     an evidentiary hearing on the motion).

26

1    sentence was imposed, pursuant to Cal. Penal Code § 186.22(b)(1)(c), for a total of thirteen (13)

2    years on count 1.  Petition, p. 4; Answer, p. 39, CT 24, 609-610, RT 1959-1960.  As to the

3    second robbery conviction, count two, under Cal. Penal Code § 211, petitioner was sentenced to

4    one-third the mid-term, to a term of one year, with the addition of one-third the midterm, or eight

5    months on the § 12202(d) enhancement, and one-third of the ten-year term under § 186.22(b)(1),

6    for a total of five years on count two to be served consecutive to count one.  Id.  (On appeal, as

7    noted in footnote two, the arming enhancements to count one and two were to be amended to

8    show they were committed pursuant to Cal. Penal Code § 12022 sub. (a) rather than (d), and

9    petitioner's sentence modified as to the second robbery count to a four-month, rather than an

10   eight-month consecutive term under § 12022(a)).  In support of his claim of a violation pursuant

11   under Blakely, petitioner states only "[t]he court gave no reason for imposition of the consecutive

12   term.  No jury instruction or verdict form was provided to the jury with regard to the

13   'consecutive' nature of Count Two."  The state appellate court addressed this claim as follows:

14            VI. *Blakely* Issue

15            In a supplemental brief, Henry claims the trial court committed
         *Blakely* error by imposing consecutive terms for the two
16       robberies.FN5 ( *Blakely v. Washington* (2004) 542 U.S. 296 [159
         L.Ed.2d 403] ( *Blakely* ).) We reject this claim.

17
                  FN5. Herman joined in the supplemental brief filed by
18                Henry.

19            In *Blakely,* the United States Supreme Court held that any fact
         other than a prior conviction that is relied on by a trial court to
20       increase the penalty for a crime beyond the statutory maximum
         must be tried to a jury and proved beyond a reasonable doubt. (
21       *Blakely, supra*, 542 U.S. at p. ----, --- S.Ct. at p. - - - - [159 L.Ed.2d
         at pp. 413-414].) The statutory maximum is the greatest sentence
22       the court can impose based on facts reflected in the jury's verdict
         or admitted by the defendant. ( *Id*. at p. ---- [542 U.S. at pp. ---- -
23       ----, 124 S.Ct. at pp. ---- - ----159 L.Ed.2d at pp. 413-414].)

24            Under the first paragraph of section 669, when sentencing a
         defendant who has been convicted of two or more crimes, the trial
25       court must "direct whether the terms of imprisonment ... shall run
         concurrently or consecutively." If the sentencing court fails to
26       make this determination, the terms are to run concurrently. (§ 669,

1    2d par.) This latter provision does not create a presumption or
     other entitlement to concurrent sentencing. ( *People v. Reeder*
2    (1984) 152 Cal.App.3d 900, 923, 200 Cal.Rptr. 479.) The absence
     of a legal right to concurrent sentencing "makes all the difference
3    insofar as judicial impingement upon the traditional role of the jury
     is concerned." ( *Blakely, supra*, 542 U.S. at p. ----, --- S.Ct. at p. - -
4    - - [159 L.Ed.2d at p. 417].)

5    The California Supreme Court recently held that the analysis in
     which a trial court engages when determining whether to run terms
6    consecutive or concurrent is " '[j]udicial factfinding in the course
     of selecting a sentence within the authorized range' " and does not
7    implicate the concerns addressed in *Blakely*. ( *People v. Black*
     (June 20, 2005, S126182) ---Cal.4th ----, ---- [2005 Cal. LEXIS
8    6566, pp. *1, *28-*29].) FN6 The high court further held: "*[
     B]lakely's* underlying rationale is inapplicable to a trial court's
9    decision whether to require that sentences on two or more offenses
     be served consecutively or concurrently," ( *id.* at p. ---- [2005 Cal.
10   LEXIS 6566 at p. *48] ) because "[t]he jury's verdict finding the
     defendant guilty of two or more crimes authorizes the statutory
11   maximum sentence for each offense" ( *id.* at p. ---- [2005 Cal.
     LEXIS 6566 at p. *49] ).

12
              FN6. The Supreme Court's decision in *Black* was not final as of the filing
13            of this opinion.

14   As consecutive sentencing was within the statutory maximum
     sentence that the trial court was authorized to impose based on the
15   jury's verdict, the holding in *Blakely* is inapplicable. Accordingly,
     we reject defendants' claim. FN7
16
              FN7. As we have determined that the holding in *Blakely* is
17            inapplicable to the imposition of consecutive sentences
              under section 669, we find it unnecessary to address the
18            People's argument that defendants' claim was forfeited by
              their failure to object in the trial court.
19

20   People v. Hill, 2005 WL 1534292, at *20-21.

21          In Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S. Ct. 2348, 2362-2363

22   (2000), the Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that

23   increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to

24   a jury, and proved beyond a reasonable doubt."  In Blakely v. Washington, 542 U.S. 296,

25   303-304, 124 S. Ct 2531, 2537 (2004), the Supreme Court held that "the 'statutory maximum'

26   for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the

1   facts reflected in the jury verdict or admitted by the defendant.

2          In <u>Cunningham v. California</u>, 549 U.S. 270, 127 S. Ct. 856, 868 (2007), the

3   Supreme Court struck down California's sentencing plan on the basis that it violated <u>Apprendi's</u>

4   "bright-line rule," i.e., that "[e]xcept for a prior conviction, 'any fact that increases the penalty

5   beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a

6   reasonable doubt.' "  The Supreme Court found that the middle term described in the California

7   statutes constituted the relevant statutory maximum, and that because aggravating circumstances

8   were found by a judge and not a jury, and need only be established by a preponderance of the

9   evidence, the sentencing scheme violated <u>Apprendi</u>.  <u>Cunningham,</u> 549 U.S. 270, 127 S. Ct. at

10  873.  Thus, in <u>Cunningham,</u> the Supreme Court, citing <u>Apprendi</u> and <u>Blakely</u>, held that

11  California's Determinate Sentencing Law violates a defendant's right to a jury trial to the extent

12  it permits a trial court to impose an upper term based on facts found by the court rather than by a

13  jury.  The Ninth Circuit also held that <u>Cunningham</u> did not announce a new rule of constitutional

14  law.  <u>Butler v. Curry</u>, 528 F.3d 624, 639 (9th Cir. 2008).  Instead, <u>Cunningham</u> applied <u>Blakely</u>

15  to the specific California sentencing plan.  <u>Id</u>.

16         The <u>Black</u> decision cited in the state appellate court opinion above, which that

17  court noted was not final at the time of their decision in petitioner's case, was ultimately

18  remanded to the California Supreme Court for reconsideration in light of <u>Cunningham</u>.

19  Nevertheless, on the issue of imposition of consecutive terms, the state's high court determined

20  that:

21              <u>Cunningham</u>, however, does not undermine our previous
             conclusion that imposition of consecutive terms under section 669
22           does not implicate a defendant's Sixth Amendment rights. In *Black
             I* we explained that " *Blakely's* underlying rationale is inapplicable
23           to a trial court's decision whether to require that sentences on two
             or more offenses be served consecutively or concurrently. We
24           previously have recognized that *Apprendi* '... treated the crime
             together with its sentence enhancement as the "functional
25           equivalent" of a single "greater" crime. [Citation.]' ( *People v.
             Sengpadychith*, *supra*, 26 Cal.4th at p. 326, 109 Cal.Rptr.2d 851,
26           27 P.3d 739.) Similarly, *Blakely* treats the crime together with a

fact that is a prerequisite to eligibility for a greater punishment as the functional equivalent of a greater crime. The high court's decisions in *Blakely* and *Apprendi* are intended to protect the defendant's historical right to a jury trial on all elements of the crime, which the court concluded would be jeopardized if a legislature could label facts affecting the length of the authorized sentence for an offense as sentencing factors rather than as elements and thereby eliminate the right to a jury trial on such facts. [¶] ... Nothing in the high court's decisions in *Apprendi*, *Blakely*, or *Booker*[22] suggests that they apply to factual determinations that do not serve as the 'functional equivalent' of an element of a crime." ( *Black I*, *supra*, 35 Cal.4th at pp. 1262-1263, 29 Cal.Rptr.3d 740, 113 P.3d 534, fn. omitted.)

People v. Black, 41 Cal.4th 799, 821, 62 Cal. Rptr.3d 569, 586 (Cal. 2007).

After noting that high courts in various states have rendered opinions consistent with the California State Supreme Court's decision in Black I "that a trial court's imposition of consecutive sentences does not violate a defendant's Sixth Amendment right to jury trial," Black [II], supra, at 822, 62 Cal. Rptr.3d at 586-587, citing, inter alia, Smylie v. State, 823 N.E.2d 679, 686 (Ind.2005); State v. Abdullah ,184 N.J. 497, 878 A.2d 746, 756 (2005); Barrow v. State 207 S.W.3d 377, 379 (Tex.Cr.App.2006); State v. Cubias ,155 Wash.2d 549, 120 P.3d 929, 931-932 (2005), the Black [II] Court observed that some state courts have determined that the Sixth Amendment requires findings by a jury if a sentencing scheme "creates a presumption in favor of concurrent sentences that may be overcome only by factual findings...." Id., at 822, 62 Cal. Rptr.3d at 587.  However, the state supreme court distinguished California's statute governing conviction for multiple offenses, including direction for concurrent or consecutive terms (Cal. Penal Code § 669), stating that it does not set forth a presumption favoring concurrent sentences, only requires the imposition of concurrent sentences as a default, should the court fail to exercise its discretion by not specifying how the terms must run.  Id.

[22] United States v. Booker, 543 U.S. 220, 243-244, 125 S. Ct. 738, 755-756 (2005) (concluding that Blakely applies to the Federal Sentencing Guidelines and reaffirming the holding of Apprendi that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." )

1    The state supreme court therefore concludes:

2    The high court's decision in Cunningham does not call into
     question the conclusion we previously reached regarding
3    consecutive sentences. The determination whether two or more
     sentences should be served in this manner is a "sentencing
4    decision[ ] made by the judge after the jury has made the factual
     findings necessary to subject the defendant to the statutory
5    maximum sentence on each offense" and does not "implicate[ ] the
     defendant's right to a jury trial on facts that are the functional
6    equivalent of elements of an offense." ( Black I, supra, 35 Cal.4th
     at p. 1264, 29 Cal.Rptr.3d 740, 113 P.3d 534.) Accordingly, we
7    again conclude that defendant's constitutional right to jury trial was
     not violated by the trial court's imposition of consecutive sentences
8    on all three counts.

9    People v. Black, at 823, 62 Cal. Rptr.3d at 587.

10       The Ninth Circuit has found that Apprendi is not implicated by the decision to run

11   sentences consecutively in the context of the federal guidelines when the sentences did not

12   violate Apprendi in their own right.  United States v. Buckland, 289 F.3d 558, 570-72 (9th Cir.

13   2002).

14       Even if Blakely were applicable to sentencing for multiple offenses, petitioner

15   would still not be entitled to relief.  Blakely requires jury determination of all facts necessary to

16   support sentencing beyond the statutory maximum.  When, as here, petitioner challenges only the

17   consecutive nature of the sentencing and not the sentence imposed for either count with

18   enhancements, Blakely is not implicated.

19       Furthermore, the Supreme Court's decisions in Apprendi, Blakely, and

20   Cunningham did not indicate that the Supreme Court's holdings would even apply to a state

21   judge's authority to impose consecutive sentences.[23]  Whether or not Blakely applies to a state's

22   consecutive sentencing scheme remains an unresolved question.  See, e.g., State v. Ice, 343 Or.

23

24   [23]  On March 17, 2008, the Supreme Court granted a petition for a certiorari to address the
     question, "Whether the Sixth Amendment, as construed in Apprendi v. New Jersey, 530 U.S.
25   466, 120 S. Ct. 2348 (2000), and Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004),
     requires that facts (other than prior convictions) necessary to imposing consecutive sentences be
26   found by the jury or admitted by the defendant." See Oregon v. Ice, --- U.S. ----, 128 S. Ct. 1657
     (2008).  A ruling is still pending, but oral arguments were heard on October 14, 2008.

1   248 (2007) (holding it does apply); State v. Kahapea, 111 Hawai'i 267, 278-80 (2006) (holding it

2   does not).  In addition, several circuits have held that a judge may impose consecutive sentences

3   based on facts not found by the jury.  See United States v. Hicks, 389 F.3d 514, 531-32 (5th

4   Cir.2004); United States v. Pressley, 345 F.3d 1205, 1213 (11th Cir.2003); United States v. Lott,

5   310 F. 3d 1231, 1242-43 (10th Cir. 2002); United States v. Hollingsworth, 298 F.3d 700, 702

6   (8th Cir.2002); United States v. Noble, 299 F.3d 907, 909-10 (7th Cir.2002); United States v.

7   White, 240 F.3d 127, 135 (2d Cir.2001).  In sum, there is no established Supreme Court authority

8   on the subject of Blakely's et al, application to consecutive sentences under state law.

9           It is true that in United States v. Fifield, 432 F.3d 1056 (9th Cir.2005), the Ninth

10   Circuit considered a Blakely challenge to consecutive sentencing under the federal guidelines.

11   The Ninth Circuit denied the claim but did not hold Blakely inapplicable in that context.  The

12   Fifield court considered how the federal sentencing guidelines actually functioned.  "Because ... a

13   district court need not find any particular fact to impose consecutive sentences," the court

14   concluded, "the imposition of consecutive sentences does not violate the Sixth Amendment."  Id.

15   at 1067.  However, this federal guidelines case does not mandate a conclusion that state

16   sentencing schemes which permit a judge to impose consecutive sentences for multiple charges is

17   violative of Apprendi et al.  Apprendi's focus is on the maximum penalty for a given charge –

18   singular.  The Supreme Court has never held that in determining the cumulative penalty for

19   separate charges involving separate incidents, which could theoretically be brought separately,

20   one has a Sixth Amendment right to concurrent sentencing absent the jury finding the basis for

21   consecutive sentencing.  Such a rule would amount to making ministerial the duties of a judge at

22   sentencing, and takes Apprendi beyond its logical basis.  The state appellate court's reasoning as

23   to this claim is not an unreasonable application of established Supreme Court authority.  This

24   court finds that petitioner is not entitled to relief on this claim.

25           Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for

26   a writ of habeas corpus be denied.

1        These findings and recommendations are submitted to the United States District

2  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

3  days after being served with these findings and recommendations, any party may file written

4  objections with the court and serve a copy on all parties.  Such a document should be captioned

5  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

6  shall be served and filed within ten days after service of the objections.  The parties are advised

7  that failure to file objections within the specified time may waive the right to appeal the District

8  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

9  DATED:   12/16/08

10                                                    /s/ Gregory G. Hollows

11                                                    _____
                                                      GREGORY G. HOLLOWS
                                                      UNITED STATES MAGISTRATE JUDGE

12

13

14

15  GGH:009
    hill0262.fr

16

17

18

19

20

21

22

23

24

25

26